**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| C.K.-W., a minor, by and through her Parent, T.K.; individually and on behalf of others similarly situated, and | ) ) ) ) | |
| D.L., a minor, by and through his parent, Z.L., individually and on behalf of others similarly situated; | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:22-cv-191 |
| WENTZVILLE R-IV SCHOOL DISTRICT; | ) ) ) | |
| Defendant. | ) ) | |

## CLASS ACTION COMPLAINT FOR PROSPECTIVE RELIEF

Individually and on behalf of a class of those similarly situated, Plaintiffs, Wentzville R-IV School District students C.K.-W., and D.L., allege as follows:

### INTRODUCTION

1.     Defendant Wentzville R-IV School District (the "District") established and implemented a policy by which its officials and employees removed from school library circulation eight critically acclaimed books: *The Bluest Eye*, by Toni Morrison; *Fun Home: A Family Tragicomic Paperback*, by Alison Bechdel; *All Boys Aren't Blue*, by George M. Johnson; *Heavy: An American Memoir*, by Kiese Laymon; *Lawn Boy*, by Jonathan Evison; *Gabi, A Girl in Pieces*, by Isabel Quintero; *Modern Romance*, by Aziz Ansari; and *Invisible Girl*, by Lisa Jewell (the "Banned Books") because of officials' dislike of the ideas contained in the Banned Books and with the intent and purpose to prescribe what is generally or traditionally accepted as right or true in matters of opinion.

2.      Plaintiffs are students in the District, each of whom possesses a First Amendment right to be free from official conduct that was intended to suppress the ideas and viewpoints expressed in the Banned Books.

3.      The Banned Books engage their readers with a diversity of ideas and minority viewpoints, including with respect to race, gender, and sexual identity. The District banned the books from school libraries because of the ideological disagreement members of the District's school board and certain vocal community members have with the ideas and viewpoints that the books express.

4.      Prospective relief is necessary and appropriate to halt the District's ongoing violation of Plaintiffs' constitutional rights to receive the information and access the ideas contained in the Banned Books at their school libraries without interference from school officials based on their disagreement with the information or ideas conveyed.

## PARTIES

5.      Plaintiff C.K.-W., a minor, brings her claim by and through her mother, T.K. C.K.-W. is a student who attends one of Defendant District's schools, all of which provide students access to a school library. Her parents plan for her to continue to attend Defendant District's schools through high school graduation.

6.      Plaintiff D.L., a minor, brings his claim by and through his mother, Z.L.. D.L. is a student who attends one of Defendant District's schools, all of which provide students access to a school library. His parents plan for him to continue to attend Defendant District's schools through high school graduation.

7.      Defendant District is a school district that provides public education to school-aged students within St. Charles County, Missouri.  It is a public school system organized and

maintained under the laws of the State of Missouri.  It has a student population of more than

17,000 students. All actions described herein were taken pursuant to policy of Defendant District

and under color of law.

## JURISDICTION AND VENUE

8.      This action arises under the U.S. Constitution and the provisions of 42 U.S.C.

§ 1983.

9.      This case presents a federal question within this Court's jurisdiction under Article

III, § 2, of the U.S. Constitution, 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343(a)

(civil rights).

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because it

is the judicial district in which Defendant is located and where substantially all the events or

omissions giving rise to the claim occurred.

11.     Venue is proper in the Eastern Division of this Court pursuant to E.D.Mo. L.R.

2.07(A)(1) and (B)(2) because Defendant is located in St. Charles County and substantially all

the events or omissions giving rise to the claim occurred in St. Charles County.

## ADDITIONAL FACTS

### *The District*

12.     Missouri has more than 2,400 public schools, which are organized into 567 public

school districts.

13.     Defendant District is one of those school districts, and its boundaries encompass

the Northwest corner of St. Charles County.

14.     Defendant District is governed by a seven-member school board, whose members

are chosen in at-large elections (the "Board").

3

15.     The Board makes policy for the District and is a final decisionmaker on how policies are interpreted and implemented.

16.     Although at least ten percent of the District's student population is non-white, the Board is all-white.

### The District's Policy

17.     The District's policies for the selection, retention, and reconsideration of books by District libraries (collectively "the policy") are set forth in the District Board Policies and Regulations.

18.     Board Policy 6310 (entitled "School Libraries," attached hereto as Exhibit 1) provides that "[t]he Board believes that it is the responsibility of the District's library/media centers to provide materials that reflect the ideals and beliefs of religious, social, political, historical and ethnic groups, and their contributions to American and world cultures." Policy 6310 recognizes that "[t]he library/media program serves as a point of access to information and ideas for students as they acquire critical thinking and problem-solving skills."

19.     Board Regulation 6310 (entitled "School Libraries," attached hereto as Exhibit 2) describes the responsibilities and guiding principles of the District's libraries, which are "concerned with generating understanding of American freedoms through the development of informed and responsible citizens" and based on the American Library Association's "Library Bill of Rights." Among the responsibilities outlined in Regulation 6310 are ensuring "maximum accessibility" to materials and providing materials "that will encourage growth in knowledge and that will develop literary, cultural and aesthetic appreciation, and ethical standards," and "which reflect the ideals and beliefs of religious, social, political, historical, and ethnic groups and their

contribution to American and world heritage and culture, thereby enabling students to develop an intellectual integrity in forming judgments."

20.     Board Regulation 6310 outlines the selection criteria for library books and provides that the librarian makes the final selection decision with approval of the school principal.

21.     Board Regulation 6310 specifies the criteria for materials that can be "weeded," or removed by a librarian because they are deemed "no longer useful": (a) items which are soiled, damaged, or torn beyond repair; (b) items which have exceeded age sensitivity; and (c) items found to contain unreliable information.

22.     Board Regulation 6310 does not provide a mechanism for appealing a librarian decision to remove a book as a part of the weeding process.

23.     Board Regulation 6310 addresses the procedure for making a complaint against library materials a student or parent finds "objectionable" as follows:

    a.  Under an initial informal procedure, "prior to a formal complaint, an informal procedure for objectionable material will be initially sought in an attempt to resolve the issue. This could include parental permission before check out, circulation note, or patron notes."

    b.  To make a formal complaint, a student or parent may obtain from the Superintendent's office Form 6241 - Review of Instructional Materials. The Superintendent and the librarian will consider a written complaint "in weighing the educational value of that particular resource, against the segment found objectionable to the complainant. Contingent with their decision, the material will be returned to the shelf for continued use, or removed from library circulation."

24.     Board 6241 Policy (Form 6241) (entitled "Challenged Materials," attached hereto as Exhibit 3) establishes overarching guidelines for the consideration of challenged materials, including:

    a.  "The Board has the ultimate responsibility for establishing the curriculum and for purchasing instructional and/or media materials to be used in the District."

    b.  "Instructional materials shall not be excluded on the basis of the writer's racial, nationalistic, political, or religious views."

    c.  "Books, or other instructional or media materials of sound factual authority, shall not be prescribed, nor removed from library shelves or classrooms on the basis of partisan or doctrinal approval or disapproval."

    d.  "[T]he principles of academic freedom and the freedom to read must be defended, rather than the materials."

    e.  "If a challenge is made, it should be properly channeled through guidelines and procedures established by the Board."

25.     Board 6241 Regulation (Form 6241) (entitled "Challenged Materials;" attached hereto as Exhibit 4) establishes the procedures to be followed for challenged materials, including challenged books, as follows:

    a.  Reporting of the complaint to the school principal;

    b.  The form "Review of Instructional Materials" shall be given to, completed by, and returned by the person making the complaint;

    c.  The questioned book will be removed from use, pending committee study and final action by the Board, unless it is a "basic text."

d.  The Superintendent appoints a review committee of nine people (Review Committee). The procedure specifies the makeup of the Review Committee, which includes one Board member, the building administrator, three teachers, and four lay persons.

e.  The Review Committee meets, reviews the written request for reconsideration, reads the questioned book, evaluates the book, and prepares a written report of its findings and recommendations to the Superintendent.

f.  The Review Committee may recommend that the questioned book be: (i) retained without restriction; (ii) retained with restriction; or (iii) not retained.

g.  The Superintendent shall, at the next appointed meeting of the Board, report the recommendations of the Review Committee to the Board. The decision of the Board will be final.

h.  The decision of the Board shall be reported to the principal of the school, to the complainant, and to other appropriate professional personnel on the next school day. The principal shall see that the decision of the Board is carried out.

26.  Regulation 6241 does not provide a mechanism for appealing a Board decision to remove a book.

27.  The departures from written policy described herein have been made or ratified by the Board such that those departures constitute the policy of the District.

### *The Bluest Eye*

28.  Toni Morrison was a critically acclaimed and beloved Black American author. Morrison published eleven novels, along with several non-fiction collections, children's books,

short stories, and plays. Morrison's multifaceted works address themes including race, Black identity, and womanhood.

29.     Morrison was awarded numerous honors and medals for her literary achievements, including the Pulitzer Prize for fiction in 1987, the Nobel Prize for Literature in 1993, the National Book Foundation's Medal of Distinguished Contribution to American Letters in 1996, the Presidential Medal of Freedom in 2012, and the PEN/Saul Bellow Award for Achievement in American Fiction in 2016.

30.     *The Bluest Eye*, first published in 1970, was Morrison's first novel. *The Bluest Eye* portrays the experiences of a young Black girl named Pecola Breedlove growing up in Lorain, Ohio, Morrison's hometown. Pecola faces racism, abuse, and instability. Pecola, who has dark skin, hair, and eyes, covets lighter features, particularly blue eyes. Her father rapes and impregnates her. Driven to madness, Pecola believes her wish for blue eyes has been granted.

31.     In 1970, a *New York Times* review of the book commended Morrison for telling the story "with a prose so precise, so faithful to speech and so charged with pain and wonder that the novel becomes poetry." John Leonard, *Books of the Times*, N.Y. TIMES, Nov. 13, 1970, *available at* https://www.nytimes.com/1970/11/13/archives/books-of-the-times-three-first-novels-on-race.html.

32.     *The Bluest Eye* is categorized as an essential American classic and remains a best-selling novel. As of February 1, 2022, it was the Number One Best Seller in Black & African American Literature on Amazon.com. *See The Bluest Eye* Amazon Product Page, https://www.amazon.com/Bluest-Eye-Vintage-International/dp/0307278441.

33.     Morrison, an African American woman, regularly challenged racism while centering the experiences of Black Americans in her writing and public discourse. For example,

in a 1993 interview with Charlie Rose, she responded to his question about the racism of white people by stating, "What *are* you without racism? Are you any good? Are you still strong? Are you still smart? Do you still like yourself? I mean, these are the questions." Joshua Barajas, *Lessons we can learn from Toni Morrison*, P.B.S. NEWS HOUR, Aug. 6, 2019, https://www.pbs.org/newshour/arts/lessons-we-can-learn-from-toni-morrison.

34.     *The Bluest Eye* was chosen for circulation in the District in accordance with District policies.

35.     Prior to being banned, physical and digital copies of *The Bluest Eye* were available to be checked out by Wentzville students without restriction. The buildings in the District that had physical copies of the book available were Holt High School, Timberland High School, and North Point High School.

36.     Prior to being banned, *The Bluest Eye* was not required reading of any curriculum used within the District. One high school Advanced Placement (AP) course recommended the book as optional supplementary reading.

### *The Other Banned Books*

37.     Alison Bechdel is a gay American cartoonist. Her critically acclaimed graphic memoir, *Fun Home: A Family Tragicomic Paperback* ("*Fun Home*") was published in 2006. *Fun Home* chronicles Bechdel's childhood and relationship with her father, who committed suicide shortly after she came out as a lesbian. *Fun Home* was a bestseller, the recipient of several awards and accolades, and was turned into a hit musical which opened on Broadway in 2015. The musical won five Tony awards, including the 2015 Tony Award for Best Musical.

38.     George Matthew Johnson is a Black American journalist and activist. Their memoir *All Boys Aren't Blue*, published in 2020, recounts their experiences growing up as a

9

queer Black person. *All Boys Aren't Blue* was well-reviewed. Johnson was inspired to write by Toni Morrison saying, "If there's a book you want to read, but it hasn't been written yet, then you must write it." Petra Mayer, *'Give Them The Damn Information': Questions For George M. Johnson*, N.P.R., May 2, 2020, https://www.npr.org/2020/05/02/848764750/give-them-the-damn-information-questions-for-george-m-johnson. It was included on numerous "best book of the year" or "recommended read" lists, including those published by *Teen Vogue*, the ALA Rainbow List, the Kids' Book Choice awards, Young Adult Library Services Association Teen's Top books, the New York Library Best Books of 2020, and the Chicago Public Library Best Books of 2020.

39. Kiese Laymon is a Black American author and professor. His memoir *Heavy: An American Memoir* ("*Heavy*") won numerous awards and nominations following its publication in 2018. *Heavy* addresses issues including racism, feminism, and family while exploring Laymon's challenging relationships with his mother, food, and gambling. *Heavy* won the 2019 Andrew Carnegie Medal for Excellence in Nonfiction, the 2018 Christopher Isherwood Prize for Autobiographical Prose, the Austen Riggs Erikson Prize for Excellence in Mental Health Media and was named one of the 50 Best Memoirs of the Past 50 Years by The New York Times. Laymon is the recipient of a 2020–2021 Radcliffe Fellowship at Harvard.

40. Jonathan Evison is the author of seven novels. His 2018 novel *Lawn Boy* explores issues of race, class, and sexual identity while portraying the struggles of a young Chicano man working as a landscaper. In 2019, the book won the American Library Association's Alex Award, which is given to ten books written for adults that have special appeal to children ages 12 through 18.

41.     Isabel Quintero, who is of Mexican descent, is a writer of young adult and children's books and poetry. Her young adult novel *Gabi, A Girl in Pieces* ("*Gabi*"), was published in 2014. *Gabi* chronicles a young Chicana woman's eventful last year of high school. In 2015, the book was placed on the Amelia Bloomer Book List, an annual annotated book list of well-written and well-illustrated books with significant feminist content, intended for young readers, ages birth through 18.

42.     Aziz Ansari is an Indian-American actor, comedian, and writer. His bestselling book *Modern Romance*, co-written with sociologist Eric Klinenberg, was published in 2016. The book combines extensive research, interviews, and personal insights in examining modern dating culture, including LGBTQ+ dating. The book was a number one *New York Times* bestseller.

43.     Lisa Jewell is the best-selling author of nineteen novels. Her novel *Invisible Girl*, published in 2021, is a thriller about the disappearance of a young mixed-race woman in London. The book was also a *New York Times* bestseller.

44.     *Fun Home*, *All Boys Aren't Blue*, *Heavy*, *Lawn Boy*, *Gabi*, *Modern Romance*, and *Invisible Girl* were chosen for circulation in the District in accordance with District policies.

45.     Prior to being banned, copies of *Fun Home*, *All Boys Aren't Blue*, *Heavy*, *Lawn Boy*, *Gabi*, *Modern Romance*, and *Invisible Girl* were available to be checked out by District students without restriction.

46.     Prior to being banned, none of the books *Fun Home*, *All Boys Aren't Blue*, *Heavy*, *Lawn Boy*, *Gabi*, *Modern Romance*, and *Invisible Girl* was required reading of any curriculum used within the District.

47.     Each of the Banned Books features and presents the perspective of an author or protagonist, or both, who is non-white, LGBTQ+, or otherwise identifies as a minority.

48.     The District's curriculum does not require particular book titles. None of the Banned Books was required reading for any student in the District.

49.     Students and parents can opt-out of reading books that are available at District libraries. Any parent or guardian in the District may at their discretion request that a restriction be placed in their own student's library account to prohibit that student from accessing any book.

50.     Library collections throughout the District contain a wide array of books with similar themes and subject matter as the Banned Books, but from different viewpoints and perspectives, and they remain available to students without restriction.

51.     Library collections throughout the District contain a wide array of books by white and heterosexual authors written from the perspective of white, straight characters that contain sexual content similar to or in excess of that which is included in the Banned Books, including depictions of sex, rape, and incest, which have never been challenged, restricted, or removed.

### Board Decision to Remove the Bluest Eye

52.     Amber Crawford, a member of the St. Charles County Parents Association, submitted a formal challenge to *The Bluest Eye* on September 30, 2021, with the rationale that the book contains "Pediphilla [*sic*], incest, rape."

53.     In response to Crawford's challenge, District Superintendent Curtis Cain appointed a Review Committee for *The Bluest Eye*.

54.     At Board meetings on October 21, 2021, and November 18, 2021, Crawford and another member of the St. Charles County Parents Association, Vanessa Hagedorn, appeared and further expressed their support of removal of *The Bluest Eye* from District libraries based on the book's viewpoints.

55.     After conducting the review outlined by District policy, an 8-1 majority of the Review Committee voted to retain *The Bluest Eye*. Six committee members voted to retain, two voted to retain with restriction, and one voted to remove the book.

56.     In its Review Committee Report, the Review Committee enumerated several reasons for its decision, including:

    a.  "[R]emoving the work would infringe on the rights of parents and students to decide for themselves if they want to read this work of literature."

    b.  "Students are not assigned this book, but rather it is a choice that is one of thousands of books in the library."

    c.  "Parents who choose to provide additional guidance for their child in selecting books fitting with their families values can communicate with the librarian to collaboratively assist that specific student."

    d.  "This novel helps the reader step into and understand 1941 (pre WWII, pre civil rights movement), small town Black culture in a way no textbook can do."

    e.  "The themes are provocative, yes, but in a thoughtful way."

    f.  "We should not ban books."[1]

57.     At a Board meeting on January 20, 2022, Director Shannon Stolle made a motion to move *The Bluest Eye* to the restricted list for access by Advanced Placement (AP) classes only with an opt-in requirement that parents provide permission to any student who wishes to access the book. Director Stolle's motion further provided that should the novel become part of the curriculum or a supplement, the same procedure will apply. Board Vice President Daniel Brice seconded Director Stolle's motion to restrict.

---

[1] A copy of the Review Committee Report, dated January 13, 2022, is attached as Exhibit 5.

58.     Board members discussed the feasibility of the motion to restrict, noting that this sort of access restriction—requiring a parent to affirmatively opt-in rather than opt-out of a minor's access to a book—is not currently in place for any book and would require the implementation of additional steps and practices for librarians and students.

59.     During discussion of the motion to restrict, it was explained that parents already are permitted to make decisions for their own children by opting-out of their child's presumptive access to any particular book on an individualized basis for their own children.

60.     The discussion also clarified that *The Bluest Eye* is not part of any District curriculum and, moreover, that parents and students individually already may opt-out of reading any particular book that is a part of a curriculum.

61.     Board Members Betsy Bates, Stolle, and Jason Goodson voted in favor of Director Stolle's motion to restrict access to *The Bluest Eye*. Board Members Erin Abbott, Sandy Garber, Dale Schaper, and Daniel Brice voted against Director Stolle's motion to restrict the book.

62.     Director Stolle's motion to restrict *The Bluest Eye* failed.

63.     Next, Board Secretary Schaper made a motion not to retain *The Bluest Eye.* Vice President Brice seconded Director Schaper's motion not to retain.

64.     The Board did not discuss the motion not to retain.

65.     Board Members Garber, Stolle, Schaper, and Brice voted in favor of Director Schaper's motion not to retain *The Bluest Eye*. Board Members Abbott, Bates, and Goodson voted against Director Schaper's motion to not retain the book.

66.     Director Schaper's motion not to the retain *The Bluest Eye* was approved.

67.     As a result of the Board's decision not to retain *The Bluest Eye*, the District permanently removed copies of the book from school shelves and digital access on January 20, 2022.

68.     *The Bluest Eye* is no longer available to students at any District school library or classroom.

69.     Alleged factual inaccuracies were not a reason *The Bluest Eye* was removed, the District has never claimed that *The Bluest Eye* contains any factual inaccuracies, and *The Bluest Eye* does not contain factual inaccuracies.

70.     On January 28, 2022, the Intellectual Freedom Committee of the Missouri Library Association (MLA-IFC), sent a letter to Board President Bates and Superintendent Cain to formally express their concern with the removal of *The Bluest Eye.* MLA-IFC notified the District that book banning efforts are "part of an organized effort to undermine the civil and intellectual rights of students, particularly those from historically marginalized groups (e.g., BIPOC and LGBTQ+ students)." No action was taken in response to the letter.

### Removal of Fun Home, All Boys Aren't Blue, and Heavy

71.     At the January 20, 2022 meeting, the Board mistakenly noted that three additional books had been pulled from library shelves as a part of the librarian "weeding" process but were "not reviewed" because "there was no determination about the books": *Fun Home*, *All Boys Aren't Blue*, and *Heavy*.

72.     Although each of *Fun Home*, *All Boys Aren't Blue*, and *Heavy* was subject to a formal challenge, upon information and belief, they were removed without the standard procedures set forth in Board Regulation 6241 for the review of challenged materials by a Review Committee and the Board.

73.     Upon information and belief, any alleged use of weeding to remove *Fun Home*, *All Boys Aren't Blue*, and *Heavy* was conducted outside of the ordinary course and procedures for the consideration of weeding.

74.     The criteria for materials that can be weeded by librarians under Board Regulation 6310 do not apply to the books *Fun Home*, *All Boys Aren't Blue*, or *Heavy* because none of these books was removed, or subject to removal, on the basis of: (a) being soiled, damaged, or torn beyond repair; (b) having exceeded age sensitivity; or (c) being found to contain unreliable information.

75.     *Fun Home*, *All Boys Aren't Blue*, and *Heavy* have been permanently removed from circulation and are unavailable to students at any District school library or classroom.

76.     *Fun Home*, *All Boys Aren't Blue*, and *Heavy* were not removed because of any alleged factual inaccuracies.

### Removal of *Lawn Boy*, *Gabi*, *Modern Romance*, and *Invisible Girl*

77.     In the 2021-22 school year, formal challenges have also been made to the following books: *Lawn Boy*, *Gabi*, *Modern Romance*, and *Invisible Girl*.

78.     Each of the books *Lawn Boy*, *Gabi*, *Modern Romance*, and *Invisible Girl* was immediately removed from library shelves pending review pursuant to Board Regulation 6241.

79.     *Lawn Boy*, *Gabi*, *Modern Romance*, and *Invisible Girl* are currently removed from circulation and unavailable to students at any District school library or classroom.

80.     *Lawn Boy*, *Gabi*, *Modern Romance*, and *Invisible Girl* were not removed because of any alleged factual inaccuracies.

### The Removed Books Have Been Targeted for Removal as Part of a Campaign to Suppress Viewpoints About Race and Sexuality

16

81.     The removal of books from Wentzville school libraries is part of a targeted campaign by the St. Charles County Parents Association ("SCCPA") and No Left Turn in Education's Missouri Chapter to remove particular ideas and viewpoints about race and sexuality from school libraries.

82.     SCCPA was established as a 501(c)(3) non-profit corporation in September 2021. The organization describes its purpose as "legally defend[ing] our children's rights & liberty against Marxism & tyranny!"  SCCPA functions as a small but vocal group of parents and third parties who advocate for issues in schools throughout St. Charles County, including the District. SCCPA provides resources for challenging educational materials in schools, advocates for the removal of school mask mandates, and organizes political gatherings. SCCPA encourages its members to attend school board meetings to make them "more exciting," even when the attendees are not parents or residents of the school district. SCCPA leadership has publicly endorsed candidates for the Board.

83.     SCCPA provides specific guidance to its members on how to challenge materials for removal from school libraries. For example, SCCPA's website provides copies of District policies and the District's review form that can be used "to begin the process." The SCCPA website confirms "[w]e have recently submitted many Challenged Material Review Forms."

84.     In targeting books for removal, the SCCPA has worked closely with the Missouri chapter of No Left Turn in Education and its president, Andy Wells. No Left Turn in Education's national website identifies dozens of targeted books, most or all of which include minority viewpoints and/or are written by minority authors. Wells has compiled a publicly available list of books available in Missouri public school libraries, including Defendant District libraries, that is

being used to identify books to challenge and coordinate future book removals. Most of, if not all, the targeted books include minority viewpoints, are written by minority authors, or both.

85.     Wells has publicly, and upon information and belief privately, interacted with SCCPA members such as Crawford (who submitted the initial challenge to *The Bluest Eye*) and members of the Board regarding book challenges. Wells has advised that challengers should talk about sexual content in the books rather than sexual orientation, sexual identity, or race to avoid legal scrutiny.

86.     In accordance with the advice of Wells and other organizations that seek to suppress viewpoints about race and sexuality from school libraries, the challengers to the Banned Books have objected to sexual content in the Banned Books on a selective basis as a pretext for suppressing access to books because of the books' viewpoints and perspectives about race and sexuality.

87.     The District's failure to use established, regular, and facially unbiased procedures for the removal of books demonstrates that the Banned Books have been removed on an arbitrary basis and not in a viewpoint-neutral manner.

88.     Students throughout the District face the threat of future harm resulting from ongoing viewpoint-based challenges to books that, absent prospective relief, are likely to cause additional books to be removed from District libraries because of officials' and community members' desire to deny students access to ideas with which they disagree and with the intent and purpose to prescribe what is generally or traditionally accepted as right or true in matters of opinion.

### *Class Allegations*

18

89.     D.L. and C.K.-Ware members of a class of current and future students in District schools who use, or will use, a District school library to access information (the "Class").

90.     Approximately 17,400 students were enrolled in Defendant District's schools during the 2020-21 school year; thus, the number of individuals in the Class of current and future students who use, or will use, a District school library to access information is so numerous that joinder of all members of the Class would be impracticable. Moreover, because the Class includes individuals who will become class members in the future, some members of the Class are unidentifiable, which is an additional reason joinder would be impracticable.

91.     There are questions of law and fact that are common to the Class, including, but not limited to, the factual questions about how Defendant's policies are utilized to remove from library circulation books expressing ideas and opinions that conflict with the ideological views of members of the Board or some community members and the legal question of whether such viewpoint-based removal of books from libraries violates the First Amendment and the Fourteenth Amendment.

92.     Plaintiffs' claim that the book-removal policy employed by Defendant District violates their rights under the First and Fourteenth Amendments is typical of the claims of the Class.

93.     Defendant District's policy has resulted in the removal of the Banned Books and the unavailability of the Banned Books to members of the Class; moreover, the District's policy causes the District's school board, officials, administrators, employees, and their agents to act on grounds generally applicable to the Class. Thus, regardless of any individual Class member's view of any particular book removal, the District's policy operates identically as to each member

of the Class, thereby making it appropriate for this Court to grant injunctive relief and any corresponding declaratory relief to the Class as a whole.

94.     As current students in a District school subject to Defendant District's policy, Plaintiffs will fairly and adequately protect the interests of the Class.

95.     The District's decision to remove the Banned Books causes the District and its employees and agents to act on grounds generally applicable to the Class, thereby making it appropriate for this Court to grant injunctive relief and any corresponding declaratory relief to the Class as a whole pursuant to Federal Rule of Civil Procedure 23(b)(2).

**CAUSE OF ACTION**

*Removal of the Banned Books violates the First Amendment*
*42 U.S.C. § 1983*

96.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

97.     The District removed the Banned Books, individually and collectively, from District libraries with the intent and purpose of preventing all students from accessing the Banned Books in District school libraries.

98.     The decisive factor in the decisions to remove the Banned Books was dislike of the ideas or opinions contained in the books by policymakers, school officials, community members, or a combination of those.

99.     The policy under which the Banned Books were removed from circulation allowed and caused the Banned Books to be removed from circulation with the intent and purpose of prescribing what is generally or traditionally accepted as right or true.

100.    The removal of the Banned Books has the symbolic effect of removing the District's imprimatur from the Banned Books and the intent, purpose, and effect of prescribing what is generally or traditionally right or true in matters of opinion.

101.    Defendant's actions to remove books were taken pursuant to District policy, as written or as interpreted or ratified by the Board.

102.    The policy and removal of the Banned Books violated the First Amendment rights, applicable here by incorporation under the Fourteenth Amendment, of Plaintiffs and the Class by restricting their access to ideas and information for an improper purpose.

103.    Defendant deprived Plaintiffs and the Class of access to the Banned Books and the ideas contained therein, uniformly preventing students who might wish to access the books from doing so while stigmatizing the ideas and viewpoints expressed by the books.

104.    Removal of the Banned Books threatens the ability of the Plaintiffs and the Class to learn and engage with a diversity of ideas and information, including seeing their own experiences reflected in the books and developing greater understanding of the experiences of others.

105.    Defendant's actions in removing the Banned Books and the ongoing challenges to books at District libraries presents a credible threat that additional books will also be removed based on their viewpoints.

106.    Unless restrained by this Court, Defendant will continue to violate the First and Fourteenth Amendment rights of Plaintiffs and the Class by continuing to withhold access to the Banned Books and will likely utilize the policy to remove additional library books from circulation because of disagreement with the ideas contained in them.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs and the Class respectfully request that this Court grant the following relief:

a) Upon motion, a preliminary injunction directing Defendant to preserve the status quo ante by ordering the District to maintain each copy of every Banned Book in the same condition as prior to its removal from circulation, return to circulation any removed books for which the evidence and law provide Plaintiffs a fair chance of succeeding on the merits of their claims that they were removed in violation of the First Amendment, and provide such other and further interim relief as is warranted by the evidence and law until further order of this Court;

b) A permanent injunction that is narrowly tailored to remedy the specific violations determined on the merits and corresponding declaratory judgment;

c) An award of Plaintiffs' Attorneys' fees, pursuant to 42 U.S.C. § 1988, and taxable costs;

d) Such other and further relief as is proper under the circumstances.

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827MO
Jessie Steffan, #64861MO
Molly E. Carney, #70570MO
Emily Lazaroff, #73811MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
Fax: (314) 652-3112
trothert@aclu-mo.org
jsteffan@aclu-mo.org
mcarney@aclu-mo.org
elazaroff@aclu-mo.org

Gillian R. Wilcox, #61278MO
ACLU of Missouri Foundation
406 W. 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
gwilcox@aclu-mo.org

*Attorneys for Plaintiffs*