**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:22-cv-191-MTS |
| WENTZVILLE R-IV SCHOOL DISTRICT; | ) ) ) | |
| Defendant. | ) ) | |

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>

As "the nurseries of democracy," public schools "have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). In contravention of this principle, and in violation of students' right to access ideas and information in school libraries free from viewpoint-based censorship, Wentzville R-IV School District (the "District") has unconstitutionally removed books from school libraries pursuant to District policy.

In particular, District policy requires automatic removal of any library book as soon as it is challenged by any student, parent or guardian, regardless of the merits of that challenge and without any enforceable timeline for review. In addition, pursuant to District policy, school officials permanently remove books from school library circulation because of dislike for the ideas and viewpoints contained within the books—as most recently demonstrated by the District's removal of eight critically-acclaimed books from school library shelves: *The Bluest*

*Eye*, by Toni Morrison; *Fun Home: A Family Tragicomic Paperback*, by Alison Bechdel; *All Boys Aren't Blue*, by George M. Johnson; *Heavy: An American Memoir*, by Kiese Laymon; *Lawn Boy*, by Jonathan Evison; *Gabi, A Girl in Pieces*, by Isabel Quintero; *Modern Romance*, by Aziz Ansari; and *Invisible Girl*, by Lisa Jewell (the "Banned Books").[1] Finally, the District has enacted a policy of permanently removing challenged books without any committee or Board review through a pretextual use of its "weeding" policy in circumstances that the policy does not govern.

This Court should enter a preliminary injunction enjoining the District from enforcing this book-removal policy, and directing the District to restore access to any library materials challenged during the current school year pending resolution of this case.

## I.  Background

### A.  District Policy: Automatic Removal, Weeding, and Review

The District, like many school districts across the country, follows a deliberate process to select items for inclusion in its library collection. A librarian with "a thorough knowledge of the curriculum, the strengths and weaknesses of the current collection, and an understanding of the students' abilities and skills" considers widely-recognized selection criteria, based on the American Association's Library Bill of Rights,[2] to determine whether a book constitutes "educational and enjoyable material[] acceptable to the student for recreational reading." Ex. 9

---

[1] A copy of each of these Banned Books will be submitted to the Clerk for filing as Exhibits 1-8, as shown on the attached exhibit list. A hard copy will also be supplied to chambers and Defendant.

[2] The selection criteria include: "1. Promotion of Literacy; 2. Alignment with District Curriculum; 3. Needs outlined by the Department of Elementary and Secondary Education; 4. Intended Age Level and Comprehensibility; 5. Potential User Appeal; 6. Quality and Durability; 7. Authoritativeness; 8. Age of Publication; 9. Price; and 10. Individual Building needs." Ex. 9 (6310 Regulation).

(6310 Regulation); *see also* Ex. 10 (6310 Policy) ("The library/media program serves as a point of access to information and ideas for students as they acquire critical thinking and problem-solving skills."); Ex. 11 (6241 Policy) ("Every effort will be made to provide materials that present all points of view concerning international, national and local problems and issues of our times"). The librarian's determination to acquire a book is subject only to the principal's approval. Ex. 9 (6310 Regulation). All new additions to the District's libraries are approved for inclusion through this process.

District policy departs from how school districts usually operate libraries, however, when any student, parent, or guardian claims that any library material should be banned or restricted. If such a person considers the material to be "objectionable in any manner," they may submit a formal challenge by simply filling out a "Review of Instructional Materials" form. *Id.* The form does not provide standards for a comprehensive review by the challenger; for example, it does not include any attestation that the challenger has read the entire text in question or considered the value of the work as a whole. Upon submission of the form, District policy requires that school officials quickly remove all electronic and hard copies of the material from circulation, effectively blocking any student from accessing the material—regardless of the basis for the challenge or its merit. Ex. 12 (6241 Regulation).

Within the District, the blocking of library materials upon the receipt of a challenge is sometimes referred to as "weeding." However, under Regulation 6310, the weeding process allows a librarian to permanently remove a title without Board review only if that item is "soiled, damaged, or torn beyond repair;" has "exceeded age sensitivity;" or has been "found to contain unreliable information." Ex 9 (6310 Regulation). School officials have stated that this weeding process was used to permanently remove three titles from circulation: *Fun Home: A Family*

*Tragicomic Paperback*, by Alison Bechdel; *All Boys Aren't Blue*, by George M. Johnson; and *Heavy: An American Memoir*, by Kiese Laymon.

Under District policy, non-weeded challenged material is blocked for all students at every grade level until, at the earliest, the following steps are complete: the Superintendent of Schools appoints a review committee consisting of members specified by the policy; the committee meets and prepares a written recommendation; the Superintendent forwards the recommendation to the Board; and the Board votes on whether to make the ban permanent. Ex 12 (6241 Regulation). No standard governs the Board's ultimate decision; it can completely ignore the review committee's recommendation, follow it to the letter, or adapt it how it sees fit. Once the Board's decision is made, District policy does not allow for any appeal.

In addition, while District policy provides a general timeline for the committee to make its recommendation, the District has failed to follow that timeline for any of the Banned Books— and there is no clear deadline for the Board's final decision, even though the mandatory, automatic removal in response to any challenge results in students losing complete school library access to the book from the time when a complaint is submitted until the Board acts.

**B. *Gabi, A Girl in Pieces***

The mandatory, near-immediate removal of challenged materials occurs without any consideration of the material as a whole, or confirmation of the authenticity of the challenge and challenger. For example, on November 18, 2021, an individual identifying herself simply as "Renee" submitted a challenge to the availability of *Gabi, A Girl in Pieces*, a novel by Isabel

Quintero. Ex. 13 (*Gabi* challenge form).[3] The District had removed all copies of the book from circulation by November 22, 2021. Ex. 14 (email re book removal status).

A review committee was appointed, and produced a report recommending that the District retain the book. On February 9, 2022, administrators sent a memo with the committee's report to the Board. Ex. 15 (*Gabi* Board Memo). At the Board's next meeting, on February 15, 2022, held hours after this lawsuit was filed, the Board adopted the recommendation to retain *Gabi*. Access was ultimately restored, but only after students had been blocked from all school library access to the book for approximately 89 days.

### C. *Lawn Boy*

The nearly three-month ban of *Gabi* was relatively short compared to the removal of access to the other Banned Books as a result of this policy. For example, Amber Crawford, a serial challenger and member of the St. Charles County Parents Association, submitted a challenge to *Lawn Boy*, a novel by Jonathan Evison, on October 1, 2021. Ex. 16 (*Lawn Boy* challenge form).[4] The book was immediately removed from circulation pursuant to District policy. The review committee for *Lawn Boy* (the same committee that was appointed for the review of *The Bluest Eye*, described below) has failed to hold a meeting or make any recommendation about *Lawn Boy* for more than five months. As of March 10, 2022, the District's students, including Plaintiffs, have been deprived of access to *Lawn Boy* for 160 days.

---

[3] In the space provided for the challenger's "name, address, telephone number," the challenger responded "Renee."

[4] Crawford also submitted formal challenges to four other books: *All Boys Aren't Blue* by George M. Johnson, *Heavy: An American Memoir*, by Kiese Laymon, *Fun Home: A Family Tragicomic* by Alison Bechdel, and *The Bluest Eye*, by Toni Morrison. Ex. 17 - 20 (challenge forms).

### D. *The Bluest Eye*

The District's policy regarding the process for the review committee's recommendations is enforced arbitrarily, and at times the Board acts without formal presentation or discussion of those recommendations. For example, after a challenge was submitted on October 8, 2021 against *The Bluest Eye*, Toni Morrison's first novel, the review committee recommended that the District retain the book. Ex. 21 (*The Bluest Eye* Board Memo). The review committee had been given a proposed timeline, resources to place the material in context, and criteria considered by the librarian in initially selecting materials, including *The Bluest Eye*, for inclusion in the collection. Ex. 22 (email providing review committee guidelines).[5] Each committee member was expected to read the challenged material in its entirety and consider certain criteria for review. *Id.* The committee met and prepared a report explaining the committee's recommendation that *The Bluest Eye* be retained, which, if adopted by the Board, would have restored student access to the novel.[6] Ex. 21 (committee report explaining rationale for recommendation to retain *The Bluest Eye*).

The Board took action against *The Bluest Eye* at its January 20, 2022 meeting. At that meeting, Dr. Keri Skeeters, the District's Assistant Superintendent for Teaching and Learning, advised the Board that, when a particular parent or family member does not want their child to

---

[5] Afterward, the challenger objected that she was not appointed to the review committee. From the current evidence, it is unclear whether she ultimately participated as a committee member. Andy Wells, president of the Missouri chapter of No Left Turn in Education, recently reported at a meeting with parents in Nixa, Missouri that the parents who had lodged the Wentzville challenges were the only committee members who voted against either review committee's recommendation that access to materials be restored.  Ex. 23 (Nixa Mtg. Transc.).

[6] Eight of the committee's nine members voted to retain *The Bluest Eye*. Two who voted to retain specified that it be retained with the restriction that a parent may elect to prevent their own children from accessing the book; however, District policy already provides for that restriction for all library materials.

access a particular book, "the best way to ensure that [their] students are not checking out a book

. . .  is to communicate with the librarian and they will put that restriction [for the particular

student]. They will note that restriction on that student account. So when a student goes to check

out the book that would . . .  pop up and  . . . the librarian would tell them that they need to make

a . . . different selection. That way it's completely individualized." Ex. 24 (Jan. 20, 2022 Bd.

Mtg. Transc.) at 61; *see also* Ex. 25 (email regarding parent choice to restrict student access).[7]

Yet the Board voted to permanently ban the book—117 days after the book was

automatically removed in response to the challenge—without allowing a formal presentation,

discussion, or any other consideration of the committee's recommendation to retain. Ex. 26

(email form Board member discussing Board decision in contravention of committee

recommendation); Ex. 27 (email from review committee member and librarian expressing

disappointment with Board disregard of committee recommendation); Ex. 28 (email from

librarian regarding lack of involvement in review process). Despite the committee's

recommendation, the Board voted, 4 to 3, to permanently ban the novel. The only articulated

basis for the permanent ban was board member Sandy Garber's contention that the challenged

books, including *The Bluest Eye*, constitute obscenity. *See* Ex. 24 at 61 (referring to section of

Criminal Code governing obscenity-related offenses and declaring "there are guidelines and they

are within this chapter about showing our minor children obscenities. And that's exactly what

these books are, are obscenities that we are either showing in a video or could be in a book"); *see*

---

[7] Video recordings of all Board meetings are currently available at
https://www.youtube.com/c/WSDvideo. As a courtesy, Plaintiffs have attached as exhibits
transcripts of the Board meetings dated January 20, 2022 (when the Board voted to remove *The
Bluest Eye*) and February 25, 2022 (when the Board voted to rescind the ban on *The Bluest Eye*).

*also id.* at 66 ("there are laws on the Missouri books about showing our children what they would call, what is defined as obscenities.").

Following that permanent ban decision, the Board's January 26, February 7, February 10, and February 15, 2022 meetings, as well its unused placeholder meeting of February 2, 2022, all passed without any other action regarding *The Bluest Eye*. At its emergency meeting on February 25, 2022, however, the Board, in the words of one board member, decided to "rescind the decision to ban" *The Bluest Eye*. Ex. 29 (Feb. 25, 2022 Bd. Mtg. Transc.). If access was restored on the next school day, then students had been blocked from accessing the novel for 151 days— nearly five months—after its swift removal upon challenge, as required by the District's policy.

### E. *Modern Romance* and *Invisible Girl*

During this school year, students, including Plaintiffs, have been blocked from accessing additional books in response to challenges.

On November 29, 2021, a challenge to *Modern Romance*, by Aziz Ansari and Eric Klinenberg, blocked students from library access to the book for several months. Students were likewise blocked from accessing *Invisible Girl*, by Lisa Jewell, following a challenge on December 2, 2021. The District has represented that students' access to *Modern Romance* and *Invisible Girl* was restored after each of these challenges was ultimately withdrawn.

### F. *Fun Home, All Boys Aren't Blue,* and *Heavy*

Finally, the District has enacted a policy of permanently removing challenged books without committee or Board review through a pretextual use of its "weeding" policy in circumstances that the policy does not govern. This caused students, including Plaintiffs, to have been denied access to *Fun Home: A Family Tragicomic Paperback*, by Alison Bechdel; *All Boys Aren't Blue*, by George M. Johnson; and *Heavy: An American Memoir*, by Kiese Laymon since

Crawford submitted challenges to each of these books on September 30, 2021. Students still lack school library access to *Fun Home*, *All Boys Aren't Blue*, and *Heavy* because, after they were challenged, the District permanently banned them without going through any review process. Ex. 24 at 62 (board member stating "we as a district have banned three books without even coming to the review committee"); Ex. 30 (email regarding status of book removals).

The District, however, cannot keep its story straight about the status of these titles. Besides telling the media and parents that their removal was part of ordinary weeding after they were challenged (despite the books not satisfying the weeding criteria), and a Board member referring to them as having been removed without review, the District's counsel now says they are among "titles under challenge and currently in committee review pursuant to District Board policy." Ex. 31 (Mar. 7, 2022 letter); *see also* Ex. 32 (email making request to "weed" electronic access to *The Bluest Eye*). In any event, students remain blocked from accessing all three titles.

### G. The Banned Books

Each of the Banned Books—including those that are still banned from school library shelves—share the common element that they are, in fact, appropriate selections for a high school library. Dr. April Dawkins, an expert on school library collections, professor, and former school librarian, who is familiar with the Banned Books, and has examined reviews of the Banned Books in professional journals, established book review sources, and award lists, opines that each title is an appropriate selection for a high school library. Ex. 33 (Dawkins Decl.) at 5-6. (A copy of Dr. Dawkins' curriculum vitae demonstrating the breadth of her expertise on school library collections is attached to her Declaration.).

9

Moreover, the District had previously reached the same conclusion. As described above, each book was already part of the District's collection and had been approved by a librarian, with oversight by the school principal. Ex. 9 (6310 Regulation).

Each of the Banned Books also presents the viewpoint of a racial or sexual minority—offering the perspective of an author or protagonist, or both, who is non-white, LGBTQ+, or otherwise identifies as a minority. Dr. Dawkins explains how each title offers a minority viewpoint that enhances its educational value for students:

- *The Bluest Eye* is a "story about the experiences of a young black girl [and] is exactly the type of selection that would enhance the diversity of any high school library collection." Ex. 33 (Dawkins Decl.) at 6.

- The *Library Journal* describes *Heavy* as a memoir that "breaks down what it means to be a large black boy growing up in Mississippi." *Id.* at 6.

- *Gabi* "has received a multitude of positive reviews as a book that provides a wonderful perspective of a young girl growing up Latina in the United States." *Id.* at 6.

- *Modern Romance* "is an exploration of modern dating in which the authors interviewed diverse focus groups in the United States and internationally," and one of its authors "is a first-generation author of Indian descent"; thus, "adding his book to a high school library would expand the diversity of the collection." *Id.* at 6.

- *Fun Home* is a "story about the author's childhood and exploration of her sexual identity" and "the type of book that would be an appropriate choice for a diverse high school library collection." *Id.* at 6.

- *Invisible Girl* "would be an appropriate selection for a diverse high school collection" because it includes "one protagonist that is seventeen and a young woman of mixed race" and "another protagonist [who] is drawn into an online world of toxic masculinity." *Id.* at 6.

- *All Boys Aren't Blue* "is a memoir that relates the story of the author growing up black and gay" that the *School Library Journal* wrote provides "encouragement and realistic guidance for queer Black youth." *Id.* at 6.

- *Lawn Boy* "is a novel about a biracial young man." *Id.* at 6.

The Banned Books share another characteristic, suggesting these commonalities in viewpoint are not mere coincidences. All of the Banned Books are included on pre-existing lists of books created by advocacy groups to encourage parents to challenge these particular books because of disagreement with their viewpoints. For example, *All Boys Aren't Blue*, *The Bluest Eye*, *Fun Home*, and *Lawn Boy* are listed by No Left Turn in Education, a national advocacy organization with a Missouri state chapter, as "books that are used to spread radical and racist ideologies to students. They demean our nation and its heroes, revise our history, and divide us as a people for the purpose of indoctrinating kids to a dangerous ideology." Ex 34 (No Left Turn book list). No Left Turn's raison d'être is disagreement with a particular viewpoint about racism. Describing the organization, its Missouri state president stated, "We're against critical race theory." Ex. 23 at 18.[8] In addition to the Banned Books, the dozens of titles on No Left Turn's suggested challenge list present minority viewpoints, including the acclaimed titles *How to be an Antiracist,* by Ibram X. Kendi, *A People's History of the United States*, by Howard Zinn, *Gender Queer: A Memoir*, by Maia Kobabe, and *The Handmaid's Tale*, by Margaret Atwood.

While the Board's recent, post-litigation decision to restore *The Bluest Eye* to school shelves might temper the negative publicity the District's barrage of book bans has drawn, it does not alter the underlying District policy, which is being used to provide those against certain viewpoints—including school and District officials—an unfettered license to ban those viewpoints from the District's libraries. The policy has caused school officials to block all

---

[8] Garber, the only board member who voted against the motion to rescind the ban on *The Bluest Eye*, shares Wells' agenda. Garber's candidate statement for her reelection effort states that among those things she will fight for are: "NO TEACHING OF THE '1619 HISTORY' OF OUR NATION! ...TRUE HISTORY ONLY!" and "NO "CRT" (Critical Race Theory) or ANY PROGRAM THAT RESEMBLES IT." Ex. 35 (Garber Candidate Statement).

students from accessing eight books expressing the viewpoints of racial and sexual minorities, and continues to govern any future book challenges.

When restoring student access to *The Bluest Eye*, Board members made clear that nothing other than the returning accessibility for that *one* title would change. One member noted, "We have other challenged materials that are coming through the committees . . . And so, my views... You know, this vote, this specific issue is- is just that." Ex. 29 at 2. And the member observed that the Board will "come forward with other challenged materials." *Id.*

Consistent with those remarks, the Board has done nothing to restore *Fun Home*, *Heavy*, and *All Boys Aren't Blue*, even though these books had never been reviewed by a committee or the Board itself. Furthermore, the District continues to refuse to move the review of *Lawn Boy* forward. As such, four books currently remain banned, with further challenges likely forthcoming pursuant to District policy.

### H. Plaintiffs

Plaintiffs D.L. and C.K.-W. are high school students who have used, and plan to continue to use, the libraries at District high schools. Ex. 36 (D.L. Decl.) at 1; *see also* Ex. 37 (Z.L. Decl.); Ex. 38 (T.K. Decl.) at 1. D.L. is interested in reading all of the Banned Books, and C.K.-W's parents would like for C.K.-W. to have access to a variety of school library materials, including the books which remain banned.

The Missouri State Conference of the National Association of the Advancement of Colored People and the St. Charles County Missouri Unit of the National Association of the Advancement of Colored People (together, "NAACP") are Missouri organizations whose members include Missouri residents and District students and parents. Ex. 39 (Chapel Decl.) at 1. These members include the parents of D.L. and C.K.-W. and other parents whose children attend

school in the District, who want their children to have access to school libraries with diverse collections, including the Banned Books.

II.     **Argument**

**A. Standard for Preliminary Injunction**

In considering the motion for preliminary injunction, this Court must determine: (a) whether Plaintiffs are likely to prevail on the merits; (b) if there exists a threat of irreparable harm to them absent the injunction; (c) the balance between this harm and the injury that the injunction's issuance would inflict upon the District; and (d) what is in the public interest. *See Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). In this case, a preliminary injunction should issue because Plaintiffs are likely to succeed on the merits of their First Amendment claim. "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted); *accord Free & Fair Election Fund v. Missouri Ethics Comm'n*, 252 F. Supp. 3d 723, 737 (W.D. Mo. 2017). Once the likelihood of success on a First Amendment claim has been established, the remaining three factors may be found without further consideration. *Rodgers v. Bryant*, 942 F.3d 451, 457 (8th Cir. 2019).

**B. Standing**

This Court is obliged to consider standing, which is easily met here.

As students in the District, D.L. and C.K-W. have standing to challenge the District's restriction on their access to library materials. *See, e.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 856 (1982) (plurality) (noting plaintiffs were students in district's high school and junior high school); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake,*

*Minn.*, 670 F.2d 771, 773 (8th Cir. 1982) (same); *accord Parents, Fams., & Friends of Lesbians & Gays, Inc. v. Camdenton R-III Sch. Dist.*, 853 F. Supp. 2d 888, 897 (W.D. Mo. 2012) ("*PFLAG*").

D.L. has used and plans to continue to use the library at Holt High School. Ex. 36 (D.L. Decl.) at 1; *see also* Ex. 37 (Z.L. Decl.). He is interested in reading all of the Banned Books, and recently checked out *Gabi* after student access to that book was restored. *Id.* D.L. would like to be able to use the school library to access the books which remain banned, namely *Fun Home*, *Heavy*, *All Boys Aren't Blue*, and *Lawn Boy*, but cannot do so because the books have been removed. *Id*. C.K.-W. also uses District libraries. Ex. 38 (T.K. Decl.) at 1. C.K.-W.'s parents would like for C.K.-W. to have access to school library materials conveying information on diverse ideas and from a variety of perspectives, including the books which remain banned, but C.K.-W. will not be able to do so if the current removals remain in place. *Id.*

In addition, both student Plaintiffs have standing because the District's policy of removing books from school libraries stigmatizes them for desiring to access the banned materials, chilling their exercise of their First Amendment right to access information, and injuring them. This stigma persists for at least some time even if a banned book is later unbanned. As the Eighth Circuit recognized in *Pratt*, "[t]he symbolic effect of removing [material from schools] is more significant than the resulting limitation of access to the story." *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake*, 670 F.2d 771, 779 (8th Cir. 1982). When a school board "has used its official power to perform an act clearly indicating that the ideas contained in [banned materials] are unacceptable and should not be discussed or considered [, t]his message is not lost on students and teachers, and its chilling effect is obvious." *Id.*; *accord PFLAG*, 853 F. Supp. 2d at 897. Students, including Plaintiffs, who might otherwise wish

14

to access the Banned Books may decline to do so even once the books are returned to shelves based on the objectively reasonable fear of being stigmatized by their peers and community members.

The NAACP Plaintiffs are Missouri organizations whose members include Missouri residents and District students and parents. Ex. 39 (Chapel Decl.) at 1. NAACP has associational standing. "The Supreme Court has explained that an association has standing to bring suit on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The Supreme Court has repeatedly found NAACP satisfies the standard for associational standing, including in cases like this where it asserts the First Amendment rights of its members.  *See Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 428 (1963) (holding NAACP has standing to assert First Amendment rights of its members); *Louisiana ex rel. Gremillion v. Nat'l Ass'n for the Advancement of Colored People*, 366 U.S. 293, 296 (1961) ("It is clear from our decisions that NAACP has standing to assert the constitutional rights of its members"); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1958).

While the participation of individual members is not required for the claim asserted or the relief requested, NAACP members have standing to sue in their own right. The individual student Plaintiffs, suing through their parents who are NAACP members, have standing. Moreover, other NAACP members who are not parties to this case have standing to maintain this

suit, and Missouri NAACP may assert their constitutional rights. *See Patterson*, 357 U.S. at 459 (rejecting contention that NAACP lacked standing to assert constitutional rights of members who are not parties to the litigation). Those members include one parent whose children attend eighth and eleventh grade in the District. Ex. 39 (Chapel Decl.) at 2. She wants her children to have access to school libraries that have collections with diverse ideas and perspectives, including the Banned Books and books that provide minority viewpoints that she reasonably fears will be banned in the future. *Id.* at 2-3.

In addition, the interests NAACP seeks to protect are germane to the organization's purpose of ensuring the political, educational, social, and economic equality of rights of all persons and eliminate race-based discrimination. Ex. 39 (Chapel Decl.). In support of its mission of ensuring equality and eliminating discrimination, the NAACP has long engaged in diverse education-related litigation and supports student access to diverse materials. *Id.*

**C.     Plaintiffs Have a Fair Chance of Prevailing on the Merits.**

**1.     Plaintiffs need show only a fair chance of success on the merits.**

Because this lawsuit challenges the book-banning policy of a school district—and not a statute—Plaintiffs need show only that they have a "fair chance of prevailing" on the merits. *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). The fair-chance standard applies "where a preliminary injunction is sought to enjoin something other than . . . a state statute." *Id*. at 732-33. It is less "rigorous" than the standard applied to preliminarily "enjoin the implementation of a duly enacted state statute." *Id.* Thus, Plaintiffs are "not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *accord Anheuser-Busch, Inc. v. VIP Prod., LLC*, 666 F. Supp. 2d 974, 981 (E.D. Mo. 2008).

16

2.    **Plaintiffs easily meet the fair-chance standard because they can demonstrate a substantial likelihood of success on the merits.**

a.    Plaintiffs have a First Amendment right to access information in school libraries free from viewpoint-based censorship.

Plaintiffs have a First Amendment right to access information and ideas through school library materials, which the District's book-banning policy violates.[9] "[T]he Constitution protects the right to receive information and ideas, . . .  This right to receive information and ideas . . . is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). And, as the Supreme Court recognized more than 40 years ago, "just as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico*, 457 U.S. at 867 (plurality). Thus, the First Amendment right to receive ideas extends to public school students, and is "directly and sharply implicated by the removal of books from the shelves of a school library." *Id.*

Students' right to receive information in school is also long-established in the Eighth Circuit. In *Pratt*, the Eighth Circuit held that, when a school district censors a school display of a film adaptation of a short story (there, Shirley Jackson's "The Lottery") and an accompanying trailer, "[w]hat is at stake is the right to receive information and to be exposed to controversial ideas – a fundamental First Amendment right." *Pratt*, 670 F.2d at 779.

Students' First Amendment right to receive ideas is at its peak in the context of a school library. "[T]he special characteristics of the school *library* make that environment especially

---

[9] "The First Amendment of the Constitution provides: 'Congress shall make no law . . . abridging the freedom of speech.'" *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958). "This freedom is among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action; and municipal ordinances adopted under state authority constitute state action." *Id.*

appropriate for the recognition of the First Amendment rights of students." *Pico*, 457 U.S. at 868.  The school library is "the principal locus" of students' freedom "'to inquire, to study and to evaluate, to gain new maturity and understanding.'" *Id.* at 869 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)); *accord Pratt*, 670 F.2d at 776; *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) (observing that a school library "is a mighty resource in the free marketplace of ideas"); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002-05 (W.D. Ark. 2003).

When it comes to banning library materials, school officials lack the discretion they have when they make judgments about what to include in the curriculum. Much like *Pico*, this case "does not involve textbooks, or indeed any books that [Wentzville] students would be required to read. On the contrary, the only books at issue in this case are *library* books, books that by their nature are optional rather than required reading." *Pico*, 457 U.S. at 861–62. The leeway school officials enjoy in determining which materials should be included in a school curriculum does not extend "beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway." *Pico*, 457 U.S. at 869.

"Boards of Education . . . have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Indeed, "[t]hat they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Id.* And, while government officials "possess[] legitimate power to protect children from harm, . . . that does not include a free-

18

floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (internal citations omitted).

While school officials are not powerless to make changes to what is available on the library shelves, they violate their students' rights when they engage in intentional official conduct to suppress the ideas and viewpoints expressed in school library materials. "[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books." *Pico*, 457 U.S. at 872 (plurality). While not all materials that are accessible in schools are "comforting" to students, "there is more at issue . . . than the sensibilities of those viewing the films" or reading the materials when a ban on materials is at issue. *Pratt*, 670 F.2d at 779. When it bans materials, a school "use[s] its official power to perform an act clearly indicating that the ideas contained in [those materials] are unacceptable and should not be discussed or considered." *Id*. That is unconstitutional. *Id*.

   b. <u>The District's automatic-removal policy is unconstitutional.</u>

Pursuant to the District's policy, "[s]tudents or parents/guardians . . . may make a formal complaint" against any material in the library that they find "objectionable in any manner." Ex. 9 (6310 Regulation). The District then automatically and nearly immediately removes the material—regardless of the stated or pretextual basis for the challenge, of the challenge's merit, or of whether the material has been challenged previously—thereby blocking access by *every* student to that material. This automatic-removal policy violates Plaintiffs' right to access information free from viewpoint-based censorship because it grants every student, parent, and guardian a heckler's veto and is an impermissible prior restraint.[10]

---

[10] That the District acts on a complaint by a private party does not make its policy any more constitutional. It is school officials who block access to school library materials, and they are

### i.   The Policy creates an official heckler's veto.

It is a bedrock First Amendment principle that the government may not enact a "heckler's veto," suppressing speech because others might react negatively to it. *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). "Listeners' reaction to speech is not a content-neutral basis for regulation," *id.*, nor is it typically a viewpoint-neutral one. *See also Bible Believers v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015) ("The heckler's veto is precisely that type of odious viewpoint discrimination."). Accordingly, "[s]peech cannot be . . . punished or banned[] simply because it might offend a hostile mob." *Forsyth*, 505 U.S. at 135.

This prohibition on heckler's vetoes applies in the library context. In *Sund v. City of Wichita Falls*, the court held that a resolution "[c]onferring upon any 300 patrons the power to remove from the children's section [of a public library] any books they find objectionable" constituted an unconstitutional "heckler's veto" because it "effectively permit[ed] the [complaining patrons] to veto lawful, fully-protected expression simply because of their adverse reaction to it." 121 F. Supp 2d 530, 549 (N.D. Tex. 2000). Indeed, the policy at issue in *Sund* was less odious than the District policy at issue here. In that case, access to library materials was not completely blocked; rather, challenged books were moved to a different section of the library. *Id*. at 534. Moreover, the demand to move the material had to be signed be 300 challengers. *Id*. Nonetheless, the court recognized that the policy not only "allow[ed] any special

---

compelled to do so by District policy. The restriction remains state action. *See, e.g., Wickersham v. City of Columbia*, 481 F.3d 591, 598 (8th Cir. 2007) (enjoining enforcement of speech restrictions where police enforced them at private entity's direction); *Shelley v. Kraemer*, 334 U.S. 1, 20 (1948) (holding restrictive covenant pertaining to St. Louis home in agreement between private parties subject to constitutional challenge where state granted judicial enforcement of restrictive covenant); *see also Reitman v. Mulkey*, 387 U.S. 369, 381 (1967) (upholding constitutional challenge to state law that "authorize(s) racial discrimination in the housing market" by private parties). Here, the District policy requiring officials to cut off access to books in response to any complaint is the cause of the censorship.

interest group to suppress Library materials on the basis of their content, [but] actually facilitate[d] an infinite number of content—and viewpoint-based speech restrictions." *Id.* Pursuant to the policy, "[a]ny group of patrons with a particular viewpoint or agenda [could] suppress books with which they disagree, from [the Banned Books] to, conceivably, . . . children's Bibles located in [school libraries]." *Id.*

The same is true here. The District policy directly enacts a heckler's veto: it requires the removal of any book from library shelves as soon as any parent, guardian, or student is, or merely claims to be, offended by it. *See* Ex. 9 (6310 Regulation); Ex. 12 (6241 Regulation) (requiring automatic removal whenever someone finds library material "objectionable in any manner"). This impermissibly turns on the reaction of those listeners to the viewpoints and ideas described in the books.

### ii. The policy is an unconstitutional prior restraint.

The District policy also imposes a prior restraint on any school library book about which a parent, guardian, or student complains. It shares the "special vice" of all prior restraints, in that it restricts the exercise of a First Amendment right "before an adequate determination that [the speech at issue] is unprotected." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973). Rather than consider the merits of any complaint before restricting access to library books, the District requires automatic and near-immediate removal.

Because prior restraints tend to suppress protected speech and enable arbitrary or discriminatory—including viewpoint-based—enforcement, they "come[] to [court] bearing a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The government "carries a heavy burden of showing justification" to overcome that presumption. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). In

particular, the government must establish that the prior restraint scheme includes (1) narrow, objective, and definite standards to guide the permission-granting authority, *Shuttlesworth*, 394 U.S.at 150–51, and (2) robust procedural safeguards to protect First Amendment rights, *Freedman*, 380 U.S. at 58–59. The District policy fails on both counts.

While the District's library materials are selected in accordance with professional standards, bans are not limited to materials that are somehow inappropriate for a school library. *Compare* Ex. 9 (6310 Regulation) (policy describing criteria for book selection) and Ex. 33 (expert explanation of professional standards for book selection). Instead, access is immediately blocked to carefully selected material as soon as someone "finds it objectionable in any manner." Ex. 9 (6310 Regulation).[11] As noted above, this turns on a listener's reaction to the viewpoints and ideas expressed in the books.

In addition, the District's standard is so vague that it constitutes no standard at all. *See Coates v. Cincinnati*, 402 U.S. 611, 614 (1971) (striking down ordinance that prohibited multiple individuals from assembling when they "conduct themselves in a manner annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others," so "no standard of conduct is specified at all"); *accord Armstrong v. D.C. Pub. Library*, 154 F.Supp.2d 67, 77–78 (D.D.C. 2001) (striking down library policy that allowed refusal of entry to anyone with an "objectionable appearance" because it relied "only upon subjective interpretation of the term 'objectionable'").

---

[11] While some of the Banned Books were ultimately returned to shelves after review, access to all challenged materials is immediately blocked and remains blocked for the months it takes to conduct the review and at least three of the Banned Books appear to have been permanently blocked without the further review process required by policy.

Moreover, while the policy tasks review committees to consider a specific set of criteria and materials, the Board can choose to ignore that recommendation entirely when making the final decision regarding permission for the book to appear on school library shelves. Ex. 12 (6241 Regulation). The Board is not required to read the Review of Instructional Materials form, the challenged book, or the committee report, or to consider *any* criteria in making a decision. *Id.* Nor is its ultimate conclusion governed by any discernible or even stated standard. *Id*. Such standardless policies grant government actors "discretion [that] has the potential for becoming a means of a particular point of view." *Forsyth Cty*., 505 U.S. at 130–31 (citation omitted). As discussed in more detail below, the Board's treatment of the Banned Books illustrates this unfortunate potential.

In addition, because the policy lacks any governing or enforceable timeline, there is a very real possibility "that constitutionally protected speech will be suppressed . . . indefinitely." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226–27 (1990). This is only compounded by the inability of any appeal of the Board's ultimate decision, which means that its "determination in practice [is] final." *Se Promotions, Ltd. v. Conrad*, 420 U.S. 546, 561 (1975).

<u>c. The District's viewpoint-based removal of the Banned Books is unconstitutional.</u>

The District's treatment of the Banned Books exemplifies the viewpoint-based nature of the automatic removal policy, as well as the District's policy of banning books because of disagreement with the viewpoints they express. These viewpoint-based removals violate Plaintiffs' First Amendment rights.

The government "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). To the contrary, the targeting of particular views is viewpoint discrimination, "an egregious form of

content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

Even in schools, "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (quotation and citation omitted). And, as noted above, *see* Part 2.a, this prohibition on viewpoint-based discrimination governs school boards' restrictions on library books.

There is ample evidence from which to conclude that Plaintiffs have a fair chance of demonstrating that the District's policy has caused school officials to block the Banned Books because of the viewpoints they express. The record shows that the Banned Books each present the viewpoint of a racial or sexual minority. That is the only thing that is different about them compared to District library materials that have not been banned.[12] In addition, the Banned Books are included on pre-existing lists of books created by advocacy groups to encourage parents to challenge these particular books because of disagreement with their viewpoint. And No Left Turn in Education, which was active in the bans here, has characterized the books as materials "that are used to spread radical and racist ideologies to students," "demean our nation

---

[12] There is no evidence that there is now or ever has been any obscene material in the District's library collection. While the record includes unsworn statements from Garber and Wells, neither of whom appears in the directory of attorneys licensed to practice in Missouri, opining that various school library books constitute obscenity, there is no competent evidence to support such a claim. Although they claim Missouri prosecutors agree with their unauthorized legal opinions, that is unlikely. *See Miller v. California*, 413 U.S. 15, 24 (1973) (defining obscenity as "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value"); *Ginsberg v. New York*, 390 U.S. 629, 646 (1968) (upholding statute prohibiting the distribution to minors of materials that "predominantly appeal[] to the prurient, shameful, or morbid interests of minors," (ii) are "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors," and (iii) are "utterly without redeeming social importance for minors").

and its heroes, revise our history, and divide us as a people for the purpose of indoctrinating kids to a dangerous ideology." Ex. 34. Each of these characterizations focuses on disagreement with, and disapproval of, the viewpoints and ideas expressed in the Banned Books.

> **i.      The Banned Books each present the viewpoint of a racial or sexual minority.**

Each of the Banned Books expresses its ideas from the particular viewpoints of a diverse author and characters. Each describes the realities, difficulties, tragedy, and beauty of living as a racial and/or sexual minority. As previously discussed, *supra* at 10, Dr. Dawkins's declaration identifies the unique minority perspective presented by each book. Ex. 33 at 6. Moreover, the authors themselves provide insight into the viewpoints they expressed through their books.

For example, Bechdel's *Fun Home* "is a look at the actual toll homophobia takes on the life of a real family [and . . .] about the power of family secrets to harm relationships and perpetuate psychic damage." Ex. 40 (Bechdel Decl.) at 2. The author attests that she wrote the book from her "unique perspective on the fear and secrecy that my father lived with as a gay (or bisexual) man, since I too was gay. But unlike my father, I had the benefit of coming of age after the liberation movements of the 1960s and 1970s which did so much to change cultural attitudes about homosexuality." *Id.* at 8. "The fact that the book is a memoir, a true story, is a large part of its value—the whole point is that it really happened, and the consequences suffered by the characters are real." *Id.* at 3.

Quintero's *Gabi*, about "a light skinned, Chicana, fat girl, [who] is trying to figure out who she is and what kind of woman she wants to become" as she attends her final year of high school, also expresses the unique viewpoint of its author and protagonist. Ex. 41 (Quintero Decl.) at 2. Quintero, a daughter of Mexican immigrants, attests that *Gabi* "deals with tough, but real issues such as sex, drug addiction, rape, family rejection, friendship, teen pregnancy, love

(familial, platonic, romantic), body issues, and societal expectations. These are all issues that I

confronted as a teen, and also that many teens continue to confront." *Id.* Quintero continues:

> I wrote *Gabi, a Girl in Pieces* because I didn't see many books like that out in the world.
> Books about a young Chicana, written by a Chicana, books about a young teen with a
> parent struggling with addiction. Books about fat girls loving themselves. This book is
> semi-autobiographical, which means that some of the events or people in the book are
> based on real things that happened to me or to teens like me. It is an insult to call it vulgar
> or inappropriate because ultimately it is my life, and the lives of teens like me, that are
> being called vulgar and inappropriate. We are not born with the privilege of our lives
> being the accepted status quo and that is why I write—out of respect and to honor our
> stories, lives, and culture, all of which are constantly under attack.

*Id*. at 8.

In *Heavy*, Kiese Laymon specifically addresses his experiences as a Black man, and as a

Black writer, stating:

> I didn't hate white folk. I didn't fear white folk. I wasn't easily impressed or even
> annoyed by white folk because even before I met actual white folk, I met every
> protagonist, antagonist, and writer of all the stories I ever read in first, second, third,
> fourth, fifth, sixth, seventh, and eighth grade. At the same time, I met Wonder Woman,
> the narrator on *The Wonder Years*, Ricky from *Silver Spoons*, Booger from *The Revenge
> of the Nerds*, Spock from *Star Trek*, Mallory from *Family Ties*, damn near all the coaches
> and owners of my favorite teams. I met Captain America, Miss America, 'The American
> Dream' Dusty Rhodes. I met Luke Skywalker and his white father, even though his white
> father's voice, outfit, and mask were blacker than thirty-seven midnights. I met poor
> white folk, rich white folk, and middle-class white folk. I met all the Jetsons, all the
> Flintstones, all the Beverly Hillbillies, the entire Full House, damn near everyone in Pee
> Wee's Playhouse, all American presidents, the dudes they said were Jesus and Adam, the
> women they said were the Virgin Mary and Eve, and all the characters on Grandmama's
> stories except for Angie and Jessie from *All My Children*. So even if we didn't know real
> white folk, we knew a lot of the characters white folk wanted to be, and we knew who we
> were to those characters.
>
> That meant we knew white folk.
>
> That meant white folk did not know us.

Ex. 4, (*Heavy*) at 71-72.

Laymon's writing expresses the importance of books like his, by writers like himself, to the

authors themselves, readers, and society. Laymon continues, "I remembered writing down and

memorizing tens of thousands of sentences written by rappers and wondering what it would feel like to write sentences black children wanted to memorize." *Id.* at 87.

ii.     **The District's policy has caused school officials to block the Banned Books because of the viewpoints they express.**

The challengers to the Banned Books effected removal by citing to selected short passages with sexual content, while disregarding the broader context and themes of each book. Moreover, depictions of sex, incest, and/or sexual assault are contained in numerous other books in the District's collection. Materials with similar sexual content to which the District has never blocked access include: Lois Lowry's *The Giver*, Vladimir Nabokov's *Lolita*, D.H. Lawrence's *Lady Chatterley's Lover*, John Updike's *Rabbit, Run*, Nathaniel Hawthorne's *The Scarlet Letter*, John Glatt's *Secrets in the Cellar*, Truddi Chase's *When Rabbit Howls*, Mindi Scott's *Living Through This*, Jenn Crowell's *Etched on me: a novel*, Carol Plum-Ucci's *The Night my Sister Went Missing*, Laurie Gray's *Maybe I Will*, Anna Todd's *After* Series, Megan McCafferty's *Sloppy Firsts (Jessica Darling Series)*, Kristin Halbrook's *Every Last Promise*, Laurie Halse Anderson's *Speak*, Anderson's *Shout*, Sarah Dessen's *Just Listen*, Anonymous' *Go Ask Alice*, Alice Sebold's *The Lovely Bones*, Stephanie Meyer's *Twilight* Series, and Stephen Chbosky's *The Perks of Being a Wallflower*. Unlike the Banned Books, these books with similar content do not feature the perspective and viewpoint of a racial or sexual minority. The author and protagonist of each of the foregoing books is white.

Although *The Bluest Eye*'s inclusion of incest was the claimed reason for permanently blocking access to it (until the board voted to rescind the ban), John Irving's *The Cider House Rules*, Stephen King's *Gerald's Game*, William Faulkner's *The Sound and the Fury*, and the *New King James Version of the Holy Bible* are accessible to the District's students in the library

and have never been blocked despite also including incest. These titles are not from the perspective of a racial or sexual minority.[13]

The District's adherence to its policy persists without alteration despite the District's knowledge that the policy is being used to target certain viewpoints. After all, it can hardly be surprising that challengers are forcing viewpoint discrimination given that, when it comes to school curricula, the organizations behind the challenges make no secret of their goal to eliminate specific viewpoints. No Left Turn and the St. Charles County Parents Association—organizations to which the individual challengers of the Banned Books belong—want what they mischaracterize as critical race theory, or "CRT," purged from curricula. Ex. 23; 34. "Critical race theory is an academic and legal framework for recognizing the systemic racism endemic in American society." Ex. 39 (Chapel Decl.) at 4; *see Benner v. St. Paul Pub. Sch., I.S.D. #625*, 380 F. Supp. 3d 869, 876 n.1 (D. Minn. 2019) (quoting John O. Calmore, *Critical Race Theory, Archie Shepp, and Fire Music: Securing an Authentic Intellectual Life in a Multicultural World*, 65 S. Cal. L. Rev. 2129, 2160 (1992)) (discussing critical race theory). "Some book challengers misconstrue the meaning and importance of critical race theory by mistakenly framing their attempts to ban diverse books with race-related themes and by non-white authors from school library shelves as a fight against the teaching of critical race theory." *Id*. Such "campaigns . . . are nationally organized, well-funded, and blatantly ignorant of the very texts they wish to erase

---

[13] By presenting this evidence showing viewpoint discrimination, Plaintiffs do not suggest that any of these titles would be proper subjects of a challenge. Rather, they illustrate that the select, out-of-context content allegedly targeted is widespread in literature that the District's library provides access to. These other books have been judged appropriate for inclusion in the District's library collection because each work has been considered as a whole—as the Banned Books each had been prior to their inclusion in the District's collection. Under the District's policy, however, there is no requirement that challenged material be examined as a whole before access is blocked, or when the school board makes the ultimate decision to retain material or make the ban permanent.

and cancel—even *burn*." Ex. 42 (Graff Decl.) at 1 (addressing modern book banning efforts in

the context of the history of literacy). "They speak for very few but speak loudly because of their

dishonest manipulation of racist, xenophobic, sexist, transphobic, and white supremacist fears

and grievances." *Id*. at 2.

Wells, president of the Missouri chapter of No Left Turn, has organized efforts to create a

list of books to challenge in Missouri schools and provided guidance on how to structure

challenges using sexual content as a pretext for viewpoint discrimination so that they can pass

legal muster. Ex. 23 (Nixa Mtg. Transc.); Ex. 43 (Wells Facebook post encouraging book

challengers to "PLEASE keep the talking points where they need to be…This will become a

legal fight and if we are putting sexual orientation or sexual identity in our statements, we are

making a losing legal argument."); Ex. 44 (Wells Facebook post requesting information to

compile comprehensive book challenge list); *see also* Ex. 45 (Wells Facebook post claiming "I

was assured that one of the school board members was a 'good Christian' and would support our

local conservative values.").

Moreover, Garber, the Board's leading proponent of banning books, has made her

pledges of "NO TEACHING OF THE '1619 HISTORY' OF OUR NATION! ...TRUE

HISTORY ONLY!" and "NO 'CRT' (Critical Race Theory) or ANY PROGRAM THAT

RESEMBLES IT" pillars of her reelection campaign. Ex. 35. Garber regularly expresses views

against minority voices, including non-white, non-English speaking, and non-Christian

minorities.  *See* Ex. 46 (Garber Facebook post stating "ALL LIVES MATTER' IF YOU VALUE

LIFE AT ALL!!!! This 'BLM' so called MOVEMENT seems to NOT BELIEVE THAT

BLACK LIVES MATTER UNLESS YOU ARE A 'BLACK' PERSON KILLED BY A WHITE

PERSON!"); Ex. 47 (Garber Facebook stating "IT IS IN THE BEST INTEREST OF

AMERICAN BUSINESS OWNERS TO DEMAND THAT ALL EMPLOYEES SPEAK
ENGLISH…AND THAT MUST START AT OUR PUBLIC SCHOOLS AS WELL!...teach
ENGLISH TO BE USED AS THEIR FIRST LANGUAGE…and STOP PANDERING TO THE
MUSLIM'S DEMANDS!"); Ex. 48 (Garber Facebook post stating "Our nation was founded on
judeo-christian principles and values and the last time I looked, Satan had nothing but
destruction for all those who followed him and not the Lord Jesus Christ!").

Likewise, serial book challenger Crawford has publicly voiced her belief that Missouri
districts should be stopped from teaching what she deems to be CRT under the guise of
"diversity, equity, and inclusion." Ex. 49 (Crawford Facebook post on CRT). Crawford has also
publicly expressed racial animus, for example, in response to a Facebook post about District
Superintendent Curtis Cain, a Black man, winning the National Superintendent of the Year
award, she claimed "we can't mention [race] at board meetings 'cause his black fragility might
be hurt." Ex. 50 (Crawford Facebook post on race).

Furthermore, the Board knew that the basis for the permanent ban of *The Bluest Eye* was
specious. On January 27, 2022, each Board member was emailed a copy of a letter from the
National Coalition Against Censorship explaining that the legal analysis non-attorney Garber had
insisted required the banning of *The Bluest Eye* by the Board was without merit. Ex. 51 (NCAC
letter). On January 28, 2022, the Intellectual Freedom Committee of the Missouri Library
Association (MLA-IFC) sent a letter to Board President Bates and Superintendent Cain to
formally express their concern with the removal of *The Bluest Eye*, which was shared with Board
members. Ex. 52 (MLA-IFC Letter). MLA-IFC notified the District that book banning efforts,
specifically including those targeting *The Bluest Eye*, are "part of an organized effort to
undermine the civil and intellectual rights of students, particularly those from historically

marginalized groups (e.g., BIPOC and LGBTQ+ students)." *Id.* On February 3, 2022, a concerned citizen informed the District that the Banned Books convey the viewpoint of a racial or sexual minority. Ex. 53 (citizen email). Yet, despite frequent meetings, the Board allowed the ban on *The Bluest Eye* to remain in effect for another month before rescinding it.

The circumstances here are strikingly similar to the facts of *Pico* itself, where school board members removed books from the library shelves after obtaining a list of "objectionable" books from a "politically conservative organization of parents concerned about education legislation." *Pico*, 457 U.S. at 857. Although the school board was able to cherry-pick excerpts from many of the disfavored books containing vulgar or sexually explicit language, the Supreme Court held that school board violated the First Amendment if they "intended by their removal decision to deny [students] access to ideas with which [the board members] disagreed, and if this intent was the decisive factor in [the school board's] decision." *Id*. at 871. Plaintiffs have a fair chance of establishing that that is precisely what occurred here.

The facts presented are also similar to—and even more egregious than—those that led the Western District of Arkansas to recognize, consistent with *Pratt*, that requiring students to get parental permission before accessing any *Harry Potter* books violated their First Amendment rights. *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003). In *Counts*, the school board overrode a recommendation by the review committee to retain the book, instead voting to restrict access to only those students whose parents had affirmatively authorized it. *Id*. The court found the burden of obtaining parental permission before exercising the First Amendment right of access was impermissible in light of the board's justifications for imposing the burden. *Id*. at 1005. The burden here is even more severe, as access is blocked to all students regardless of parental permission. Moreover, in contrast to *Counts*, there is no evaluation of the

reason for the challenge before access first is revoked—it is automatic if any person finds any material objectionable for any reason.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000); *accord Phelps-Roper v. Koster*, 713 F.3d 942, 949 (8th Cir. 2013). Because Plaintiffs have shown the District's policy has restricted their free speech right to be free from government suppression of the ideas and viewpoints expressed in library materials, it is the District's burden to prove its policy is constitutional. Ultimately, the District cannot satisfy this burden. The District's policy of requiring school officials to block access to library materials upon demand of any parent, guardian, or child infringes upon Plaintiffs' right to be free from intentional official conduct that suppresses the ideas and viewpoints expressed by school library materials. Thus, Plaintiffs have a fair chance of success on the merits.

**D.     The remaining *Dataphase* factors favor entry of a preliminary injunction.**

When plaintiffs have shown a likely violation of their First Amendment rights, the other preliminary injunction requirements "are generally deemed to have been satisfied." *Swanson*, 692 F.3d at 870; *accord Phelps-Roper v. Cty. of St. Charles*, 780 F. Supp. 2d 898, 900-01 (E.D. Mo. 2011). There is no basis for departing from the general rule here. Nonetheless, Plaintiffs also satisfy the remaining *Dataphase* factors.

**1.     Plaintiffs face the threat of irreparable harm based on the District's violation of their First Amendment rights and the stigma resulting from book bans.**

First, "a 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)). As previously discussed, the District's policy deprives Plaintiffs and other

District students of their First Amendment right to access ideas and information. Moreover, this constitutional violation stigmatizes the library materials to which access is blocked. The Eighth Circuit held that "this second, stigmatic injury is 'more significant.'" *PFLAG*, 853 F. Supp. 2d at 899 (quoting *Pratt*, 670 F.2d at 779). Blocking all students' access to specific material, even if not permanently, works a First Amendment harm. *See Pratt*, 670 F.2d at 779 (holding that a school's restriction of access to a film constituted use of "its official power to perform an act clearly indicating that the ideas contained in the films are unacceptable and should not be discussed or considered"); *accord Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003) (recognizing that the restriction of particular library materials may stigmatize those materials, resulting in stigmatization of those who choose to read them)..

Even members of the Board recognize the stigmatizing effect of a temporary ban. The Board's vice president, who initially voted in favor of the permanent ban on *The Bluest Eye* but later voted to rescind it, remarked, "I think we brought enough attention to this book that the parents are aware that this book is gonna be in the library, and if they don't want their kids reading it, they can- they can call up and make it to where their kids are not able to check the book out of the library." Ex. 29 at 3. Even though students may now access *The Bluest Eye* again, the District made clear that the ideas contained in the novel are unacceptable and should not be discussed or considered. *See Pratt*, 670 F.2d at 779. Students that nevertheless choose to read previously banned books and explore the viewpoints and ideas contained therein will not only have been harmed by the prior lack of access to the Banned Books, but also must face the ongoing threat of stigma from their peers and community members.

**2. The balance of equities favors ongoing student access to library materials.**

Second, "[t]he balance of equities . . . generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by City of Manchester*, 697 F.3d 678. The preliminary injunction sought by Plaintiffs will not harm others. While this case proceeds, the injunction will only prevent further blocking of student access to library materials based on the District's automatic removal and viewpoint-based Board removal processes. There is little risk of harm because each of the materials in the District's libraries has been selected for inclusion by a librarian based on the criteria in the District's selection policies, which are consistent with the applicable best practices and professional standards. *Compare* Ex. 9 (6310 Regulation) (policy describing criteria for book selection) and Ex. 33 (expert explanation of professional standards for book selection). Even as to the books that have been banned, Dr. Dawkins views each as appropriate for inclusion in the collection. *See* Ex. 33. Moreover, in the unlikely event material is identified that is physically damaged, has exceeded age sensitivity, or contains unreliable information, the District's "weeding" policy may be used in a viewpoint-neutral manner to remove it from the collection.

A preliminary injunction will not burden others. It is true that students, parents, and guardians would not have the ability to force District officials to immediately block access to a work for every student in the District upon demand. To the extent this is a right, it is not one found in the Constitution, so it must give way to rights protected by the First Amendment. Moreover, Plaintiffs are aware of no court finding that there exists a right to prevent *other people's children* from accessing particular school library materials. *See Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 760 (1996) (holding that "overly restrictive" regulations "sacrifice important First Amendment interests for too speculative a gain." (citations and quotations omitted).

The preliminary injunction will not diminish the rights of any parents to restrict their own child's access to library material. Under the District's other policies, parents will retain the right to block the access of their child to any specific library material they wish. As the District's Assistant Superintendent for Teaching and Learning, Dr. Skeeters, stated, "the best way to ensure that students are not checking out a book . . .  if you wish that they don't check out that book is to communicate with the librarian and they will put that restriction" on the particular student account. Ex. 24 at 61. "That way it's completely individualized." *Id.*; *see also* Ex. 25 (email re parent choice). This approach is consistent with that of the Supreme Court, which has insisted that those who do not want to receive materials must take action to shield themselves, rather than place barriers in the way of others' access to information. *Lamont v. Postmaster General,* 381 U.S. 301, 307 (1965).

The balance of harms favors a preliminary injunction in this case because when access to the District's collection of materials is blocked, First Amendment rights are not the only things lost. For example, the Bechdel and Quintero affidavits describe the countless positive responses they have received from young people who have read their work.  Bechdel explains, "The book has clearly been a way for different generations to connect in a way that my father and I were unable to. I should also say that many of the responses I get from readers have nothing to do with the theme of sexuality, but are about the experience of family secrets in general." Ex. 40 (Bechdel Decl.) at 4; *see also* Ex. 41 (Quintero Decl.) at 6-8. These sorts of responses are not unique; descriptions of how a particular book at a particular time have changed the course of an individual's life are frequent. Such opportunities may pass if a piece of literature is not accessible at a particular time simply because someone had some objection to it. Allowing access to books with diverse viewpoints will provide students with educational opportunities to relate to and

learn from the experiences of others, expanding their minds and worldviews. *See* Ex. 42 (Graff

Decl.) at 7 ("Conflicting with the ignorant claims of the banners, talented authors write books

that speak to a wide range of youth experiences so that the young may see themselves, and

others, in their full humanity. We need more of these books and widely available, not fewer.").

### 3.   The protection of students' First Amendment rights is in the public interest.

Finally, "it is always in the public interest to protect constitutional rights." *Nixon*, 545

F.3d at 690; *accord Fuller v. Norman*, 936 F. Supp. 2d 1096, 1098 (W.D. Mo. 2013). The public

interest is served by preventing future book banning under the likely unconstitutional policy

while this case is considered on the merits. *Parents, Fams., & Friends of Lesbians & Gays, Inc.*

*v. Camdenton R-III Sch. Dist.*, 853 F. Supp. 2d 888, 902 (W.D. Mo. 2012) (finding public

interest favors entry of an injunction against school library blocking access to website and

recognizing "[v]iewpoint discrimination by a state actor is antithetical to the First Amendment,

one of our country's most cherished constitutional rights."). The public interest supports an

injunction that is necessary to prevent a government entity from violating the Constitution. *Doe*

*v. South Iron R-1 School Dist.*, 453 F. Supp. 2d 1093, 1103 (E.D. Mo. 2006).

### C. Bond of $100 is appropriate.

"The court may issue a preliminary injunction or a temporary restraining order only if the

movant gives security in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.

65(c); *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1105 (S.D. Iowa 2020). "The amount

of the bond rests within the sound discretion of the trial court." *Stockslager v. Carroll Elec. Co-*

*op. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). A bond of $100.00 is adequate here, consistent

with similar cases. *Ahmad v. City of St. Louis*, No. 4:17 CV 2455 CDP, 2017 WL 5478410, at

*18 (E.D. Mo. Nov. 15, 2017) (setting preliminary injunction bond at $100.00 in First Amendment case); *O'Toole v. City of Walnut Grove*, 238 F. Supp. 3d 1147, 1150 (W.D. Mo. 2017) (same); *Abdullah v. Cty. of St. Louis*, 52 F. Supp. 3d 936, 948 (E.D. Mo. 2014) (same); *Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge*, 983 F. Supp. 2d 1137, 1151 (E.D. Mo. 2013) (same); *Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge.*, 914 F. Supp. 2d 1041, 1052 (E.D. Mo. 2012) (same); *see also Pence v. City of St. Louis*, 958 F. Supp. 2d 1079, 1087 (E.D. Mo. 2013) (setting bond at $10.00); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004) (declining to require bond for preliminary injunction). In this case, a preliminary injunction bond of $100.00 is appropriate.

## Conclusion

For the foregoing reasons, this Court should grant a preliminary injunction enjoining the District from enforcing its policy allowing parent-, guardian-, or student-initiated book challenges as it applies to library materials, including prohibiting the District from temporarily or permanently banning additional books, and directing the District to restore access to any books that were permanently or temporarily removed from school libraries during this school year and for which access has not been restored, including *Fun Home*, *Heavy*, *All Boys Aren't Blue*, and *Lawn Boy*.[14]

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827MO
Jessie Steffan, #64861MO
Molly E. Carney, #70570MO

---

[14] The return of access for *Fun Home*, *Heavy*, *All Boys Aren't Blue*, and *Lawn Boy* will maintain the status quo as it existed for years without incident prior to the intervention of the policy challenged in this case.

Emily Lazaroff, #73811MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
Fax: (314) 652-3112
trothert@aclu-mo.org
jsteffan@aclu-mo.org
mcarney@aclu-mo.org
elazaroff@aclu-mo.org

Gillian R. Wilcox, #61278MO
ACLU of Missouri Foundation
406 W. 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
gwilcox@aclu-mo.org

*Attorneys for Plaintiffs*

<u>Certificate of Service</u>

I certify that a copy of the foregoing was addressed to the following and send by FedEx on March 14, 2022:

Wentzville R-IV School District
c/o Dr. Curtis Cain, Superintendent
280 Interstate Drive
Wentzville, Missouri 63384

<u>/s/ Anthony E. Rothert          </u>