**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MISSOURI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,<br><br>    Plaintiffs,<br><br>    v.<br><br>WENTZVILLE R-IV SCHOOL DISTRICT;<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 4:22-cv-191-MTS<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

As "the nurseries of democracy," public schools "have a strong interest in ensuring that future generations understand the . . . aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). Wentzville R-IV School District violates this principle and students' right to access information in school libraries free from viewpoint-based censorship in three ways: by (a) automatically removing library material when any student, parent, or guardian formally complains it is "objectionable" regardless of the merit; (b) permanently removing school library material based on disagreement with the ideas and viewpoints expressed; and (c) allowing permanent removal of challenged material without any committee or Board review through misapplication of its "weeding" policy. [1] A preliminarily injunction restoring the status quo ante and enjoining the challenge-based removal of materials is warranted.

---

[1] District policies have led to the removal of at least 8 library books during this school year: *The Bluest Eye*, by Toni Morrison; *Fun Home: A Family Tragicomic Paperback*, by Alison Bechdel; *All Boys Aren't Blue*, by George M. Johnson; *Heavy: An American Memoir*, by Kiese Laymon; *Lawn Boy*, by Jonathan Evison; *Gabi, A Girl in Pieces*, by

## I.     <u>Background</u>

The District follows a deliberate process to select items for its library collection. A librarian with "a thorough knowledge of the curriculum, . . . the current collection, and . . . students' abilities and skills" considers widely-recognized selection criteria,[2] to determine whether a book is "educational and enjoyable material[] acceptable to the student for recreational reading." Ex. 9 (6310 Regulation); *see also* Ex. 10 (6310 Policy); Ex. 11 (6241 Policy) (materials should "present all points of view").[3] The librarian's acquisition decision is subject only to the principal's approval. Ex. 9. All library additions are approved through this process.

Unlike other school districts, the District enables any student, parent, or guardian to dictate when library material should be banned or restricted. If they consider material "objectionable in any manner," they may simply fill out a "Review of Instructional Materials" form. *Id.* This does not require that the challenger has read the material in its entirety or considered the value of the work as a whole. Upon form submission, District policy requires that school officials remove all electronic and hard copies of the material from circulation and student access—regardless of the basis for the challenge or its merit. Ex. 12 (6241 Regulation).

Policy provides for a "weeding" process by which a librarian can remove a title when it is "soiled, damaged, or torn beyond repair;" has "exceeded age sensitivity;" or has been "found to contain unreliable information." Ex 9). School officials may have used "weeding" pretextually to permanently remove three of the Banned Books from circulation.

---

Isabel Quintero; *Modern Romance*, by Aziz Ansari; and *Invisible Girl*, by Lisa Jewell (the "Banned Books"). Ex. 1–8 (*see* Index of Exhibits, attached).

[2] The selection criteria, which are based on the American Library Association Library Bill of Rights, include: "1. Promotion of Literacy; 2. Alignment with District Curriculum; 3. Needs outlined by the Department of Elementary and Secondary Education; 4. Intended Age Level and Comprehensibility; 5. Potential User Appeal; 6. Quality and Durability; 7. Authoritativeness; 8. Age of Publication; 9. Price; and 10. Individual Building needs." Ex. 9.

[3] Exhibits are incorporated herein in their entirety.

Under District policy, challenged material is blocked until, at the earliest, after: 1) a review committee is appointed, meets, and prepares a recommendation; 2) the recommendation is sent to the Board; and 3) the Board votes whether to make the ban permanent. Ex 12. No standard governs the Board's decision, and it cannot be appealed. While policy provides a general timeline for committee review, it has not been followed for any of the Banned Books. No timeframe governs the Board's decision.

The mandatory, immediate removal of challenged material occurs without review of the material or evaluation of the challenge's merits. For example, on November 18, 2021, an individual identifying herself only as "Renee" challenged *Gabi, A Girl in Pieces*. Ex. 13 (challenge form). Within 4 days, all copies were removed from circulation. Ex. 14 (email re book removal status). A review committee eventually produced a report recommending the book be retained. On February 9, administrators sent the recommendation to the Board. Ex. 15 (Board Memo). On February 15, the Board agreed, and access was restored—but only after students had been blocked from access for approximately 89 days.

On October 1, 2021, Amber Crawford—a serial challenger and member of the St. Charles County Parents Association—challenged *Lawn Boy*. Ex. 16 (challenge form).[4] The book was removed. The review committee has not met. As of March 10, 2022, students have been deprived of access to *Lawn Boy* for 160 days.

At times the Board acts without formal presentation or discussion of the committee recommendation. For example, a challenge was submitted on October 8, 2021 against *The Bluest Eye*. Ex. 21 (Board Memo). Each committee member was expected to read the entire book and

---

[4] Crawford also submitted formal challenges to four other books. Ex. 17–20 (challenge forms).

3

consider certain criteria. Ex. 22 (email with review committee guidelines).[5] The committee recommended retention.[6] Ex. 21. At the Board's January 20, 2022 meeting, District Assistant Superintendent Dr. Keri Skeeters advised the Board that a parent can restrict their child's access to any library book by having a restriction placed on the student's account; "[t]hat way it's completely individualized." Ex. 24 (Jan. 20, 2022 Bd. Mtg. Transc.) at 61; *see also* Ex. 25.[7]

Yet the Board voted to permanently ban *The Bluest Eye*—117 days after automatic removal—without a formal presentation or discussion of the committee's recommendation. Ex. 26 (email discussing Board decision); Ex. 27 (email from review committee member and librarian); Ex. 28 (email from librarian). The only articulated basis for the 4-to-3 vote was a contention that *The Bluest Eye* constitutes obscenity. *See* Ex. 24 at 61 (referring Criminal Code's obscenity-related offenses and declaring "obscenities [are] . . . exactly what these books are").

The Board then held five meetings without any other action regarding *The Bluest Eye* before "rescind[ing] the decision to ban" the novel at its February 25 emergency meeting. Ex. 29 (Feb. 25, 2022 Bd. Mtg.). Students had been blocked from access for nearly five months.  Board members were clear that nothing other than access to this *one* title would change. *See* Ex. 29 at 2.

On November 29, 2021, a challenge to *Modern Romance* blocked access to the book for several months. Students were likewise blocked from accessing *Invisible Girl* following a challenge on December 2, 2021. The District has represented that students' access to these two books was restored after each of these challenges was ultimately withdrawn.

---

[5] Andy Wells, president of the Missouri chapter of No Left Turn in Education, recently reported at a meeting with parents that the challengers were the only committee members who voted against restoring access. Ex. 23 (Nixa Mtg.).

[6] Eight of the committee's nine members voted to retain *The Bluest Eye*. Two who voted to retain specified that it be retained with the restriction that a parent may elect to prevent their own children from accessing the book; however, District policy already provides for that restriction for all library materials.

[7] Video recordings of all Board meetings are available at https://www.youtube.com/c/WSDvideo. Transcripts of the January 20 and February 25 Board meetings are attached as exhibits.

Finally, the District permanently removes challenged books without committee or Board review through the pretextual use of its "weeding" policy, even where the policy doesn't apply. Under this pretext, students have been denied access to *Fun Home*, *All Boys Aren't Blue*, and *Heavy* since challenges were submitted on September 30, 2021. Upon challenge and without any review, the District permanently banned these books. Ex. 24 at 62 (board member stating "we as a district have banned three books without even coming to the review committee"); Ex. 30.[8]

Each of the Banned Books is appropriate for a high school library. Dr. April Dawkins, an expert on school library collections and former school librarian, is familiar with the Banned Books and has examined numerous sources of reviews considered by experts in the field and concluded that each would be an appropriate selection that would enhance the diversity of a school library collection. Ex. 33 (Dawkins Decl.) at 5-6. The District previously reached the same conclusion. *See* Ex. 9. Each of the Banned Books presents the viewpoint of author or protagonist, or both, who is racial and/or sexual minority. Dr. Dawkins explains how each book's minority viewpoint enhances its educational value. *The Bluest Eye* is a "story about the experiences of a young black girl." Ex. 33 at 6. *Heavy* is a memoir that "breaks down what it means to be a large black boy growing up in Mississippi." *Id. Gabi* "has received a multitude of positive reviews as a book that provides a wonderful perspective of a young girl growing up Latina in the United States." *Id. Modern Romance* "is an exploration of modern dating in which the authors interviewed diverse focus groups," and one of its authors "is a first-generation author of Indian descent." *Id. Fun Home* is "about the author's childhood and exploration of her sexual identity." *Id. Invisible Girl* includes "one protagonist that is seventeen and a young woman of mixed race"

---

[8] However, counsel now says they are among "titles under challenge and currently in committee review pursuant to District Board policy." Ex. 31 (Mar. 7, 2022 letter); *see also* Ex. 32 (email making request to "weed" electronic access to *The Bluest Eye*). In any event, students remain blocked from accessing all three titles.

and "another protagonist [who] is drawn into an online world of toxic masculinity." *Id. All Boys Aren't Blue* "is a memoir that relates the story of the author growing up black and gay." *Id. Lawn Boy* "is a novel about a biracial young man." *Id.*

In addition, the Banned Books are on lists of books created by advocacy groups to encourage parents to challenge based on their viewpoints. For example, *All Boys Aren't Blue*, *The Bluest Eye*, *Fun Home*, and *Lawn Boy* are among titles presenting minority viewpoints listed by No Left Turn in Education, a national advocacy organization with a Missouri state chapter, as "books that are used to spread radical and racist ideologies to students" and which "demean our nation and its heroes, revise our history, and divide us as a people for the purpose of indoctrinating kids to a dangerous ideology." Ex 34 (No Left Turn book list). Describing the organization's fight against certain viewpoints, its Missouri state president stated, "[w]e're against critical race theory." Ex. 23 at 18.[9]

District policy has caused school officials to block all students from accessing eight books expressing the viewpoints of racial and sexual minorities and continues to govern any future book challenges. The Board has done nothing to restore *Fun Home*, *Heavy*, and *All Boys Aren't Blue*, even though these books were not reviewed by a committee or the Board itself. Furthermore, the District still has not commenced review of *Lawn Boy*.

Plaintiffs D.L. and C.K.-W. are District students. Ex. 36 (D.L. Decl.); Ex. 37 (Z.L. Decl.); Ex. 38 (T.K. Decl.) at 1. Missouri State Conference and the St. Charles County Missouri Unit of the National Association of the Advancement of Colored People (together, "NAACP") are organizations whose members include District students and parents. Ex. 39 (Chapel Decl.) at 1.

---

[9] Garber, the only board member who voted against the motion to rescind the ban on *The Bluest Eye*, shares Wells' agenda. Garber's candidate statement for her reelection effort states that among those things she will fight for are: "NO TEACHING OF THE '1619 HISTORY' OF OUR NATION! ...TRUE HISTORY ONLY!" and "NO "CRT" (Critical Race Theory) or ANY PROGRAM THAT RESEMBLES IT." Ex. 35 (Garber Candidate Statement).

## II.   <u>Argument</u>

### A. Standard for Preliminary Injunction

In considering the motion for preliminary injunction, this Court must determine: (a) whether Plaintiffs are likely to prevail on the merits; (b) the threat of irreparable harm absent the injunction; (c) the balance between this harm and the injury that an injunction would inflict on the District; and (d) the public interest. *See Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). In this case, a preliminary injunction should issue because Plaintiffs are likely to succeed on the merits of their First Amendment claim. "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted).

### B.   Plaintiffs Have a Fair Chance of Prevailing on the Merits.

### 1.   Plaintiffs need show only a fair chance of success on the merits.

Because this lawsuit challenges the book-banning policy of a school district—and not a statute—Plaintiffs need show only that they have a "fair chance of prevailing" on the merits. *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). The fair-chance standard is less "rigorous" than the standard applied to preliminarily "enjoin the implementation of a duly enacted state statute." *Id.*  Thus, Plaintiffs are "not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *accord Anheuser-Busch, Inc. v. VIP Prod., LLC*, 666 F. Supp. 2d 974, 981 (E.D. Mo. 2008).

### 2.   Plaintiffs have a substantial likelihood of success on the merits.

a.     <u>Plaintiffs have a First Amendment right to access information in school libraries free from viewpoint-based censorship.</u>

Plaintiffs have a First Amendment right to access information and ideas through school library materials. "[J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech . . . in a meaningful manner, such access prepares students for . . . participation in the pluralistic, often contentious society in which they will soon be adult members." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality). Thus, the First Amendment right to receive ideas extends to public school students. *Id.* When a school district limits book access, "a fundamental First Amendment right" is at stake. *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake*, 670 F.2d 771, 779 (8th Cir. 1982).

This right is at its peak in the context of a school library. "[T]he special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights of students." *Pico*, 457 U.S. at 868.  The school library is "the principal locus" of students' freedom "'to inquire, to study and to evaluate, to gain new maturity and understanding.'" *Id.* at 869 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)); *accord Pratt*, 670 F.2d at 776; *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) (observing that a school library "is a mighty resource in the free marketplace of ideas"); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 3d 996, 1002-05 (W.D. Ark. 2003).

When it comes to banning library materials, the leeway school officials enjoy in determining which materials should be included in curriculum does not apply. *Pico*, 457 U.S. at 869. Rather, "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books."  *Pico*, 457 U.S. at 872. "[T]here is more at issue . . . than the sensibilities of those viewing" challenged library materials when a ban is at issue. *Pratt*, 670 F.2d at 779. A ban is the school "using its official power to perform an act

clearly indicating that the ideas contained in [those materials] are unacceptable and should not be discussed or considered." *Id*.

     b.    <u>The District's automatic-removal policy is unconstitutional.</u>

District policy is that "[s]tudents or parents/guardians . . . may make a formal complaint" against any library material they find "objectionable in any manner." Ex. 9. School officials must then automatically remove the material for *every* student.

     **i.  The Policy creates an official heckler's veto.**

The government may not enact a "heckler's veto," suppressing speech because others might react negatively to it. *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). "Listeners' reaction to speech is not a content-neutral basis for regulation," *id.*, nor is it typically a viewpoint-neutral one. *See also Bible Believers v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015) ("The heckler's veto is . . . odious viewpoint discrimination."). The prohibition on heckler's vetoes applies in the library context. In *Sund v. City of Wichita Falls*, the court held that a resolution "[c]onferring upon any 300 patrons the power to remove from the children's section [of a public library] any books they find objectionable" constituted an unconstitutional "heckler's veto" because it "effectively permit[ed] the [complaining patrons] to veto lawful, fully-protected expression simply because of their adverse reaction to it." 121 F. Supp 2d 530, 549 (N.D. Tex. 2000). The court recognized the policy "facilitate[d] an infinite number of content—and viewpoint-based speech restrictions." *Id.* "Any group of patrons with a particular viewpoint or agenda [could] suppress books with which they disagree," even, "conceivably, . . . children's Bibles." *Id.* Likewise, District policy enacts a heckler's veto by requiring officials to remove access to any book that a challenger finds objectionable. *See* Exs. 9; 12. This denies all students access based on the reaction of one stranger to the viewpoints and ideas described in the books.

     **ii. The policy is an unconstitutional prior restraint.**

District policy also imposes a prior restraint on any school library book that a parent, guardian, or student finds objectionable. It shares the "special vice" of all prior restraints by restricting the exercise of a First Amendment right "before an adequate determination that [the speech at issue] is unprotected." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973). While library materials are selected in accordance with professional standards, bans are subject to no standard. Access is immediately blocked as soon as someone "finds it objectionable in any manner," regardless of the merit of the challenge.

Because prior restraints tend to suppress protected speech and enable arbitrary or discriminatory—including viewpoint-based—enforcement, they "come[] to [court] bearing a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). To overcome that burden, the government must establish that the scheme includes (1) narrow, objective, and definite standards to guide the permission-granting authority, *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150–51 (1969), and (2) robust procedural safeguards to protect First Amendment rights. *Freedman v. State of Md.*, 380 U.S. 51, 58–59 (1965). District policy has neither.

The District's standard is no standard at all. *See Coates v. Cincinnati*, 402 U.S. 611, 614 (1971) (striking down ordinance regulating "annoying" conduct because "[c]onduct that annoys some people does not annoy others"); *accord Armstrong v. D.C. Pub. Library*, 154 F.Supp.2d 67, 77–78 (D.D.C. 2001) (striking down library policy that allowed refusal of entry to anyone with an "objectionable appearance"). Neither a challenger nor the Board is required to read the book or follow any criteria, and the Board can ignore the committee recommendation entirely for any or no reason. Ex. 12.  When it comes to First Amendment activity, such standardless policies grant government actors "discretion [that] has the potential for becoming a means of a particular point of view." *Forsyth Cty.*, 505 U.S. at 130–31. In addition, because the policy lacks any governing or

enforceable timeline, it is possible "that constitutionally protected speech will be suppressed . . . indefinitely." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226–27 (1990).

> c. The District's viewpoint-based removal of the Banned Books is unconstitutional.

The District's treatment of the Banned Books exemplifies the viewpoint-based nature of the automatic removal policy, as well as the District's policy of banning books because of disagreement with the viewpoints they express. The government "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). To the contrary, the targeting of particular views or ideas is viewpoint discrimination, "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Even in schools, "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (quotation and citation omitted). There is ample evidence from which to conclude that Plaintiffs have a fair chance of demonstrating the policy causes school officials to block materials because of their viewpoints**.**

Each of the Banned Books expresses its ideas from the viewpoint of a diverse author or characters. The minority viewpoint is the only thing that is different about the Banned Books compared to library materials never banned.[10] *See* Ex. 33 at 6 (describing diverse viewpoints and literary value of the Banned Books).

---

[10] There is no evidence that there is now or ever has been any obscene material in the District's library collection. While the record includes unsworn statements from Garber and Wells, neither of whom appears in the directory of attorneys licensed to practice in Missouri, opining that various school library books constitute obscenity, there is no competent evidence to support such a claim. *See Miller v. California*, 413 U.S. 15, 24 (1973) (defining obscenity as "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value"); *Ginsberg v. New York*, 390 U.S. 629, 646 (1968) (upholding statute prohibiting the distribution to minors of materials that "predominantly appeal[] to the prurient, shameful, or morbid interests of minors," (ii) are "patently offensive to

11

The authors express these viewpoints to provide a perspective that might otherwise be inaccessible to students. For example, Bechdel's *Fun Home* "is a look at the actual toll homophobia takes on the life of a real family [and . . .] about the power of family secrets to harm relationships and perpetuate psychic damage." Ex. 40 (Bechdel Decl.) at 2, 3, 8. Quintero, a daughter of Mexican immigrants, attests that *Gabi* "deals with tough, but real issues." Ex. 41 (Quintero Decl.) at 2.[11] In *Heavy*, Kiese Laymon specifically addresses his experiences as a Black man and writer.[12]

The challengers to the Banned Books forced removal under the policy by objecting to short passages with sexual content out of context while disregarding the works as a whole. Depictions of sex, incest, and sexual assault are contained in numerous books in the District's

---

prevailing standards in the adult community as a whole with respect to what is suitable material for minors," and (iii) are "utterly without redeeming social importance for minors").

[11] Quintero further says she wrote *Gabi* "because I didn't see many books like that out in the world. Books about a young Chicana, written by a Chicana, books about a young teen with a parent struggling with addiction. Books about fat girls loving themselves. This book is semi-autobiographical, which means that some of the events or people in the book are based on real things that happened to me or to teens like me. It is an insult to call it vulgar or inappropriate because ultimately it is my life, and the lives of teens like me, that are being called vulgar and inappropriate. We are not born with the privilege of our lives being the accepted status quo and that is why I write—out of respect and to honor our stories, lives, and culture, all of which are constantly under attack." *Id*. at 8.

[12] Laymon writes, "I didn't hate white folk. I didn't fear white folk. I wasn't easily impressed or even annoyed by white folk because even before I met actual white folk, I met every protagonist, antagonist, and writer of all the stories I ever read in first, second, third, fourth, fifth, sixth, seventh, and eighth grade. At the same time, I met Wonder Woman, the narrator on *The Wonder Years*, Ricky from *Silver Spoons*, Booger from *The Revenge of the Nerds*, Spock from *Star Trek*, Mallory from *Family Ties*, damn near all the coaches and owners of my favorite teams. I met Captain America, Miss America, 'The American Dream' Dusty Rhodes. I met Luke Skywalker and his white father, even though his white father's voice, outfit, and mask were blacker than thirty-seven midnights. I met poor white folk, rich white folk, and middle-class white folk. I met all the Jetsons, all the Flinstones, all the Beverly Hillbillies, the entire Full House, damn near everyone in Pee Wee's Playhouse, all American presidents, the dudes they said were Jesus and Adam, the women they said were the Virgin Mary and Eve, and all the characters on Grandmama's stories except for Angie and Jessie from *All My Children*. So even if we didn't know real white folk, we knew a lot of the characters white folk wanted to be, and we knew who we were to those characters.

That meant we knew white folk.

That meant white folk did not know us."

Ex. 4 (*Heavy*) at 71-72.

collection.[13] These books with similar content do not feature the perspective and viewpoint of a racial or sexual minority, and they have not been banned.

Although *The Bluest Eye*'s inclusion of incest was the claimed reason for blocked access, John Irving's *The Cider House Rules*, Stephen King's *Gerald's Game*, William Faulkner's *The Sound and the Fury*, and the *New King James Version of the Holy Bible* are accessible to students and have never been blocked despite also including incest. These titles are not from the perspective of a racial or sexual minority.[14]

In addition, the Banned Books are included on suggested challenge lists that focus on disapproval of the viewpoints and ideas expressed in the Banned Books, particularly what they characterize as critical race theory. *See* Exs. 23; 34; *see also* 39 at 4 (defining CRT); Ex. 42 (Graff Decl.) (addressing modern book banning efforts in the context of the history of literacy).

Here, the book challengers have publicly demonstrated animus towards minority viewpoints. Wells organized creation of a list of books to challenge in Missouri schools and provided guidance on how to structure challenges using sexual content as a pretext for viewpoint discrimination. Ex. 23 (Nixa Mtg. Transc.); Ex. 43 (encouraging book challengers to "PLEASE keep the talking points where they need to be…This will become a legal fight and if we are

---

[13] Materials with similar sexual content to which the District has never blocked access include: Lois Lowry's *The Giver*, Vladimir Nabokov's *Lolita*, D.H. Lawrence's *Lady Chatterley's Lover*, John Updike's *Rabbit, Run*, Nathaniel Hawthorne's *The Scarlet Letter*, John Glatt's *Secrets in the Cellar*, Truddi Chase's *When Rabbit Howls*, Mindi Scott's *Living Through This*, Jenn Crowell's *Etched on me: a novel*, Carol Plum-Ucci's *The Night my Sister Went Missing*, Laurie Gray's *Maybe I Will*, Anna Todd's *After* Series, Megan McCafferty's *Sloppy Firsts (Jessica Darling Series)*, Kristin Halbrook's *Every Last Promise*, Laurie Halse Anderson's *Speak*, Anderson's *Shout*, Sarah Dessen's *Just Listen*, Anonymous' *Go Ask Alice*, Alice Sebold's *The Lovely Bones*, Stephanie Meyer's *Twilight* Series, and Stephen Chbosky's *The Perks of Being a Wallflower*. The author and protagonist of each of these books is white.

[14] By presenting this evidence showing viewpoint discrimination, Plaintiffs do not suggest that any of these titles would be proper subjects of a challenge. Rather, they illustrate that the select, out-of-context content allegedly targeted is widespread in literature that the District's library provides access to. These other books have been judged appropriate for inclusion in the District's library collection because each work has been considered as a whole—as the Banned Books had had been prior to their inclusion in the District's collection. District's policy, however, has no requirement that challenged material be examined as a whole before access is blocked, or when the school board makes the ultimate decision to retain material or make the ban permanent.

putting sexual orientation or sexual identity in our statements, we are making a losing legal

argument."); Ex. 44 (compiling book challenge list); *see also* Ex. 45 (claiming "I was assured that

one of the school board members was a 'good Christian' and would support our local

conservative values."). Garber, the Board's leading proponent of book bans, regularly expresses

views against CRT and minority voices, including non-white, non-English speaking, and non-

Christian minorities. *See* Ex. 35; 46-48. Serial book challenger Crawford believes that Missouri

districts should be stopped from teaching "diversity, equity, and inclusion," which she views as

CRT. Ex. 49. Crawford has also expressed racial animus, for example, regarding Superintendent

Cain, a Black man, winning the National Superintendent of the Year award, she claimed "we

can't mention [race] at board meetings 'cause his black fragility might be hurt." Ex. 50.

Furthermore, the Board knew that the basis for the permanent ban of *The Bluest Eye* was

specious well before rescinding it. On January 27, the National Coalition Against Censorship sent

the Board a letter explaining why the banning of *The Bluest Eye* was without legal merit. Ex. 51

(NCAC letter). On January 28, the Intellectual Freedom Committee of the Missouri Library

Association notified the District that book banning efforts, including of *The Bluest Eye*, are "part

of an organized effort to undermine the civil and intellectual rights of students, particularly those

from historically marginalized groups (e.g., BIPOC and LGBTQ+ students)." Ex. 52 (MLA-IFC

Letter). On February 3, a concerned citizen informed the District that the Banned Books convey

the viewpoint of a racial or sexual minority. Ex. 53 (citizen email). Yet, despite frequent

meetings, the Board allowed the ban on *The Bluest Eye* to remain in effect for another month.

The circumstances here are strikingly similar to the facts of *Pico* itself, where school

board members removed books from the library shelves after obtaining a list of "objectionable"

books from a "politically conservative organization of parents concerned about education

legislation." *Pico*, 457 U.S. at 857. Although school board members were able to cherry-pick

excerpts from many of the disfavored books containing vulgar or sexually explicit language, they violated the First Amendment if they "intended by their removal decision to deny [students] access to ideas with which [the board members] disagreed, and if this intent was the decisive factor in [the school board's] decision." *Id*. at 871.  Plaintiffs have a fair chance of establishing that that is precisely what occurred here.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000); *accord Phelps-Roper v. Koster*, 713 F.3d 942, 949 (8th Cir. 2013). Because Plaintiffs have shown the District's policy has restricted their free speech right to be free from government suppression of the ideas and viewpoints expressed in library materials, it is the District's burden to prove its policy is constitutional. The District cannot satisfy this burden.

**C.     The remaining *Dataphase* factors favor entry of a preliminary injunction.**

Once the likelihood of success on a First Amendment claim has been established, the remaining three factors may be found without further consideration. *Rodgers v. Bryant*, 942 F.3d 451, 457 (8th Cir. 2019). Nonetheless, Plaintiffs also satisfy the remaining *Dataphase* factors.

First, "a 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)). Moreover, this constitutional violation stigmatizes the banned library materials. "[T]his second, stigmatic injury is 'more significant.'" *Parents, Fams., & Friends of Lesbians & Gays, Inc. v. Camdenton R-III Sch. Dist.*, 853 F. Supp. 888, 899 (W.D. Mo. 2012) (quoting *Pratt*, 670 F.2d at 779); *accord Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003) (recognizing that the restriction of particular library materials may stigmatize those materials and students who choose to read them); *see also* Ex. 29 at 3. Even though students

may now access *The Bluest Eye*, the District made clear that the ideas contained therein are

unacceptable and should not be discussed or considered. *See Pratt*, 670 F.2d at 779.

Second, "[t]he balance of equities . . . generally favors the constitutionally-protected

freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on

other grounds by City of Manchester*, 697 F.3d 678. Moreover, there is little risk of harm because

each library material was deliberately selected for inclusion, consistent with the applicable best

practices, and remain appropriate. *See* Exs. 9; 33. And the preliminary injunction will not

diminish the rights of any parents to restrict their own child's access to any specific library

material under other District policies. *See* Ex. 24 at 61; Ex. 25. This is consistent with the

Supreme Court's insistence that those who do not want to receive materials must take action to

shield themselves, rather than place barriers in the way of others' access to information. *Lamont

v. Postmaster General,* 381 U.S. 301, 307 (1965). So long as books are banned, students will be

deprived by the denial of opportunities to learn from and connect to the experiences of others. *See*

Ex. 40 (Bechdel Decl.) at 4; Ex. 41 (Quintero Decl.) at 6-8; Ex. 42 (Graff Decl.) at 7.

Finally, "it is always in the public interest to protect constitutional rights." *Nixon*, 545

F.3d at 690. *See also PFLAG*, 853 F. Supp. 2d at 902 (finding public interest favors entry of an

injunction against school library blocking access to website and recognizing "[v]iewpoint

discrimination by a state actor is antithetical to the First Amendment, one of our country's most

cherished constitutional rights.").

## <u>Conclusion</u>

For the foregoing reasons, this Court should grant a preliminary injunction enjoining the

District policy allowing parent-, guardian-, or student-initiated book challenges as it applies to

library materials and directing the District to restore access to any books that were removed from

school libraries during this school year and for which access has not been restored.[15]

<div style="margin-left:50%">

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827MO
Jessie Steffan, #64861MO
Molly E. Carney, #70570MO
Emily Lazaroff, #73811MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
Fax: (314) 652-3112
trothert@aclu-mo.org
jsteffan@aclu-mo.org
mcarney@aclu-mo.org
elazaroff@aclu-mo.org

Gillian R. Wilcox, #61278MO
ACLU of Missouri Foundation
406 W. 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
gwilcox@aclu-mo.org

*Attorneys for Plaintiffs*

</div>

---

[15] The return of access for *Fun Home*, *Heavy*, *All Boys Aren't Blue*, and *Lawn Boy* will maintain the status quo as it existed for years without incident prior to the intervention of the policy challenged in this case.