**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| C.K.-W., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:22-cv-00191-MTS |
| v. | ) | |
| | ) | |
| WENTZVILLE R-IV SCHOOL | ) | |
| DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs' quotation from *Mahanoy* reflects a misunderstanding of the very aphorism they seek to rely upon.  Wentzville R-IV School District (the "District") has not prevented any of its students from *saying* anything (or otherwise expressing themselves) in this matter.  Rather, it is Plaintiffs who have openly announced their intent (and called upon the Court) to override the broad discretion of the District's democratically elected (and accountable) Board of Education (the "Board") in effectuating its educative mission as a public school district[1] and then compel the District to affix its seal and "imprimatur" of approval to certain forms of expression in its own libraries.  (*See* Doc. 6, ¶ 127).  Plaintiffs' asserted right of access to information in school libraries is not as established, and certainly not as well defined, as they claim.  Even granting the existence of such a right, the notion that any books were removed from District library shelves because a majority of the Board supposedly just disliked the views of racial or sexual minorities simply does not pass muster.  Further, Plaintiffs' own Motion for Preliminary Injunction (Doc. 19) fails to

---

[1] *See* District Policy 0120 (Exhibit A).

demonstrate the existence of any credible threat of irreparable harm to Plaintiffs C.K.-W. or D.L. in the absence of injunctive relief.

Plaintiffs' repeated and inflammatory accusations of book banning—despite being informed of the contrary (Doc. 19-24)—are blatant mischaracterizations of the District's actions and have no place in this case.  *See ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1218 (11th Cir. 2009).[2]  The District received a formal challenge to *Lawn Boy* by a local resident on October 1, 2021, and temporarily removed the book from District libraries. (Declaration of Keri Skeeters, attached hereto as Exhibit L, ¶ 26).  The District formed a review committee for *Lawn Boy* on October 18, 2021, but the preparation of the committee report has been delayed due to logistical difficulties in obtaining copies of the book for all committee members.  (*Id*. at ¶¶ 27-28).  The District had also received a formal challenge to *The Bluest Eye* by a local resident on October 8, 2021, and temporarily removed the book from circulation in District libraries.  (*Id*. at ¶ 18).  The District formed a review committee for *The Bluest Eye* on October 18, 2021, which later met and prepared its report on November 29, 2021.  (*Id*. at ¶¶ 19-20).  The Board elected to take up the challenge to *The Bluest Eye* at its January 20, 2022 meeting, during which a majority of the Board voted to not retain *The Bluest Eye*.  (*Id*. at ¶¶ 21-22).  On February 25, 2022, the Board rescinded the January 20, 2022 decision and then approved the retention of *The Bluest Eye* without restrictions, whereafter the book was returned into circulation in District's libraries.  (*Id*. at ¶¶ 24-25).  *Invisible Girl: A Novel; Gabi, A Girl in Pieces*; and *Modern Romance: An Investigation* were temporarily removed from circulation in District libraries upon receipt of formal challenges to each of these books.  (*Id*. at ¶ 29).  The appointment of review

---

[2] "The Board did not ban any book.  The Board removed from its own school libraries a book that the Board had purchased for those libraries with Board funds.  It did not prohibit anyone else from owning, possessing, or reading the book.  The overwrought rhetoric about book banning has no place here."

committees for *Gabi, A Girl in Pieces* and *Modern Romance: An Investigation* were delayed due to the necessity of locating nine individuals willing and able to review the book in accordance with the District's committee guidelines.  (*Id*. at ¶ 32).  The District received a withdrawal of the challenge to *Invisible Girl: A Novel* prior to the formation of a review committee and a withdrawal of the challenge to *Modern Romance: An Investigation* prior to the time for completion of a committee report—whereupon the books were returned into circulation without restrictions.  (*Id*. at ¶¶ 33, 35-36).  The review and preparation of committee reports for *Gabi, A Girl in Pieces* and *Modern Romance: An Investigation* was delayed due to the delay in committee formation, the amount of material under consideration, and scheduling constraints.  (*Id*. at ¶ 34).  On February 15, 2022, the Board unanimously sustained a motion to retain *Gabi, A Girl in Pieces* without restrictions (Doc. 6, ¶ 100), after which District placed the book back in circulation (*Id*. at ¶¶ 37-38).  *All Boys Aren't Blue; Heavy: An American Memoir,* and *Fun Home: A Family Tragicomic* were removed contemporaneously with the submission of formal challenges against each book.  (*Id*. at ¶ 39).  The appointment of review committees for these books were delayed due to the necessity of locating nine individuals willing and able to review the book in accordance with the District's committee guidelines.  (*Id*. at ¶ 40).  The review and preparation of the committee reports for these books has been delayed due to the amount of material under consideration and scheduling constraints.  (*Id*. at ¶ 41).

To be clear, as of the filing of this Memorandum, the Board has not voted to remove any of the Subject Books[3] at issue in this case, with the exception of *The Bluest Eye* which, as Plaintiffs recognize (*see* Document 19, p. 4), has since been returned to circulation pursuant to a subsequent

---

[3] Collectively, *The Bluest Eye*, by Toni Morrison; *Fun Home: A Family Tragicomic,* by Alison Bechdel; *All Boys Aren't Blue,* by George M. Johnson; *Heavy: An American Memoir,* by Kiese Laymon; *Lawn Boy,* by Jonathan Evison; *Gabi, A Girl in Pieces,* by Isabel Quintero; *Modern Romance: An Investigation,* by Aziz Ansari; and *Invisible Girl: A Novel* by Lisa Jewell.

3

Board vote.  Access to some of the other Subject Books in District libraries was temporarily halted pursuant to District policy and then later restored upon committee review and Board vote[4] or withdrawal of the respective challenge.[5]   Access to the remaining Subject Books has been temporarily halted pending committee review, which is consistent with the District's policies and regulations for challenged materials.[6]  Plaintiffs' Motion (Doc. 19) fails to show that the drastic remedy of a preliminary injunction is warranted in this case and the Court should therefore deny the same.

## **Legal Standard**

The granting of a preliminary injunction is an "extraordinary remedy," and the movant bears the burden of establishing the propriety of an injunction.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  In deciding a motion for a preliminary injunction, the district court evaluates: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest."  *Id*.  The "likelihood of success on the merits" standard is a question of whether the movant has a "fair chance of prevailing" after discovery and a full trial.  *Planned Parenthood Minn. v. Rounds*, 467 F.3d 716, 721 (8th Cir. 2006).  However, in weighing the factors, "no single factor is determinative." *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  "[A] preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits, even in First Amendment cases, and the district court must still consider the other factors …." *Rodgers v. Bryant*, 942 F.3d 451, 466 (8th Cir. 2019) (internal citations and

---

[4] *Gabi, A Girl in Pieces.*
[5] *Modern Romance: An Investigation* and *Invisible Girl: A Novel.*
[6] *Fun Home: A Family Tragicomic, All Boys Aren't Blue, Heavy: An American Memoir,* and *Lawn Boy.*

quotations omitted).  The adjudication of a motion for preliminary injunction is subject to review

for abuse of discretion.  *Watkins Inc.*, 346 F.3d at 841.

**Argument**

I.     **PLAINTIFFS  HAVE  NOT  DEMONSTRATED  A  FAIR,  MUCH  LESS
SUBSTANTIAL, CHANCE OF PREVAILING ON THE MERITS**

A. **The District has broad and substantial discretion to formulate educational policy
and to review challenged materials consistent with their policies.**

The U.S. Supreme Court has "long recognized that local school boards have broad

discretion in the management of school affairs," subject to constitutional bounds.  *Bd. of Educ. v.*

*Pico*, 457 U.S. 853, 863-64 (1982) (citing *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923) (plurality

opinion); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534 (1925); *Epperson v. Arkansas*, 393 U.S. 97,

104 (1968)) (plurality opinion).  Indeed, "[b]y and large, public education in our Nation is

committed to the control of state and local authorities."  *Epperson*, 393 U.S. at 104.  "Courts do

not and cannot intervene in the resolution of conflicts which arise in the daily operation of school

systems and which do not directly and sharply implicate basic constitutional values."  *Id*.  The

Supreme Court has further acknowledged public schools as vehicles for "inculcating fundamental

values necessary to the maintenance of a democratic political system," that ought to be afforded

substantial discretion in accomplishing this mission, particularly with respect to matters of

curriculum.  *See Pico*, 457 U.S. at 864, 869 ("We are therefore in full agreement with petitioners

that local school boards must be permitted to establish and apply their curriculum in such a way

as to transmit community values, and that there is a legitimate and substantial community interest

in promoting respect for authority and traditional values be they social, moral, or political."

(Internal citations and quotations omitted)) (plurality);[7] *Ambach v. Norwick*, 441 U.S. 68, 76-77

---

[7] *See id*. at 889 ("If, as we have held, schools may legitimately be used as vehicles for inculcating fundamental values
necessary to the maintenance of a democratic political system, school authorities must have broad discretion to fulfill

(1979). While it is well-settled that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," it is similarly axiomatic that the First Amendment rights of such students are not "automatically coextensive with the rights of adults" and must be applied "in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988) (internal citations and quotations omitted).

### B. The precedential value and standard of the Supreme Court's plurality opinion in *Pico* is suspect.

It cannot be ignored that the highest authority in the land on the interpretation of the law was sharply divided and unable to reach a majority consensus in the first and only case wherein it analyzed the constitutionality of a school board's removal of books from a school library. *See generally*, *Pico*, 457 U.S. 853 (plurality). Four of the Justices found that students had some degree of a First Amendment right to access information in public school libraries (two joining the lead opinion and one concurring). *Id*. at 855-82. One Justice concurred only in the judgment, opining that it was not necessary (and thus not proper) at that point to decide the "difficult" and "largely uncharted" First Amendment issues raised by the case. *Id*. at 883-84 (White, J., concurring in the judgment). The remaining four Justices expressly rejected the existence of any student right to receive information from third parties via the school district,[8] characterizing the plurality opinion as a "lavish expansion going beyond any prior holding under the First Amendment"[9] and reasoning (compellingly in the District's view) that (*inter alia*):

> If the school board can set the curriculum, select teachers, and determine initially what books to purchase for the school library, it surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it.

---

that obligation." (Internal citations and quotations omitted)) (Burger, C.J., dissenting, joined by Powell, Rehnquist, and O'Connor, JJ.).

[8] *Id*. at 885-93 (Burger, C.J., dissenting, joined by Powell, Rehnquist, and O'Connor, JJ.).

[9] *Id*. at 885 (Burger, C.J., dissenting, joined by Powell, Rehnquist, and O'Connor, JJ.).

*Id.* at 921 (O'Connor, J., dissenting).  It is well established that a plurality opinion is not binding precedent.  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 96 (2008).  Indeed, other circuits have questioned whether *Pico* has any precedential value at all. *See ACLU of Fla., Inc*, 557 F.3d at 1200; *Chiras v. Miller*, 432 F.3d 606, 619 n. 32 (5th Cir. 2005); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (plurality opinion of Hill, J.).

Furthermore, there are two facts that further limit *Pico*'s applicability (if any) to the present case.  First of all, *Pico* dealt with the permanent removal of school library books following committee review and Board vote.  457 U.S. at 857-58.  Here, the Board has thus far only voted to permanently remove *The Bluest Eye,* a decision it later rescinded—the other Subject Books are or were only temporarily unavailable pending committee review and Board vote.  Second, the plurality opinion premised its distinction of school library selections from matters of curriculum based on the entirely voluntary use of the defendants' school libraries by students.[10]  *Pico*, 457 U.S. at 869.  In contrast, here the declaration of Minor Plaintiff D.L. indicates that District libraries are more curricular in nature.[11]  (Doc. 19-29).  In light of these factors, the District would submit that the unsettled nature of the law in this area and the nebulousness of Plaintiffs' asserted right militate against a finding of a "fair chance" of prevailing on the merits in this case.

   **C. Even applying *Pico*, Plaintiffs have not sufficiently demonstrated a likelihood that the District removed any of the Subject Books because of a mere dislike of the ideas expressed therein.**

---

[10] "It appears from the record that use of the Island Trees school libraries is completely voluntary on the part of students. Their selection of books from these libraries is entirely a matter of free choice; the libraries afford them an opportunity at self-education and individual enrichment that is wholly optional. Petitioners might well defend their claim of absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community values." 457 U.S at 869 (plurality).

[11] Plaintiff D.L. attests that: (1) the District library only allows students to check out two books at one time; (2) D.L.'s library slots are "often" used to check out books for classwork; (3) D.L. has and is currently enrolled in District courses that require D.L. to check out books from the District library; and (4) D.L. currently has two books checked out from the District library.  (Doc. 19-29, ¶¶ 6, 11-13).

The plurality opinion in *Pico* concluded that "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  457 U.S. at 872 (internal citations and quotations omitted).  However, it also acknowledged that school districts could remove library books that were vulgar or educationally unsuitable.  *Id*. at 871.  Even assuming *arguendo* that Plaintiffs do possess some right to require the District to provide them access to third party materials via school libraries (which is not conceded) and that *Pico*'s plurality standard governs the scope of that right (which, again, is dubious), the "facts" proffered thus far do not sufficiently establish any racial or sexual "dislike" on the part of the Board—or even by the purported "serial" book challengers.  Rather, Plaintiffs call upon the Court to impose the extraordinary measure of a preliminary injunction on the basis of a convoluted series of speculative and unsubstantiated aspersions by which Plaintiffs erroneously seek to impute some nefarious motive to the District.

### i.      The District's book review and removal processes are not standardless.

District Policy 6241 (Doc. 6-3) explicitly articulates what is self-evident about the District's policies and regulations—they should be read *in pari materia*.  ("If a challenge is made [to materials], it should be properly channeled through guidelines and procedures established by the Board.").  While Regulation 6241 (Doc. 6-4) sets forth guidelines regarding complaints against any type of District material and provides that challenged media will be removed pending committee review and board vote (unless it is a "basic text"), this is not the standardless procedure Plaintiffs attempt to tar it as.  Policy 6240, in addition to establishing various principles for the selection of instructional materials, provides that "materials shall not be excluded on the basis of the writer's racial, nationalistic, political, or religious views … nor removed from library shelves

or classrooms on the basis of partisan or doctrinal approval or disapproval."[12]  (Exhibit D).  Policy 6310 further provides that "[s]election of and access to library/ media materials will be based upon the contribution to the education program and the age appropriateness of the materials."  (Exhibit G).  The District also promulgates various guidelines for the review committee itself.  (*See* Doc. 19-15).  Additionally, Regulation 6241 sets out a general timeline for the challenge process—fifteen school days from receipt of challenge to form a review committee and then twenty school days from committee formation to meet and prepare a written report which is subsequently presented to the Board at the next Board meeting.[13]  (Doc. 6-4; Exhibit L, ¶¶ 12-13).  Contrary to Plaintiffs' assertions, the District has by and large abided by the general timeline, though some delays have arisen in instances due to circumstances beyond the District's control.  (Exhibit L, ¶¶ 18-41).

### ii.   **Plaintiffs have not demonstrated any book removal motivated by dislike of viewpoint.[14]**

#### a.   *Supposed viewpoint discrimination.*

Plaintiffs' supposed evidence of viewpoint discrimination is riddled with inaccuracies, tenuous conjecture, and unsubstantiated assertions.  Plaintiffs' claim that the racial and/or sexual minority viewpoint of the Subject Books is the only thing that distinguishes the Subject Books from the rest of the District's library books that have never been "banned" is misleading.  Even setting aside that Plaintiffs have not at this point substantiated the existence and contents of the purported comparable books (*see* Doc 19, p. 13 n. 13), Plaintiffs' conclusion is the product of selectively comparing the Subject Books to cherry-picked titles.  The District provides access to numerous titles containing the viewpoints of individuals of various races and sexual orientations

---

[12] Regulation 6241 itself also contemplates challenges based on "honest differences of opinion."  (Exhibit F).
[13] The Board's decision can be appealed via the District's public complaint procedures.  *See* Policy 1480 (Exhibit C).
[14] The District addresses Plaintiffs' legal arguments out of order.

that have never been challenged or removed.  (Exhibit L, ¶ 45).  At least eight such texts are also named on the purported No Left Turn challenge list (*see* Doc. 19-27).[15]  (Exhibit L, ¶ 46).  For all of Plaintiffs' intimations of a broad-reaching, targeted campaign by "serial" book challengers to purge District libraries of minority viewpoints, these titles (and many others like them) have remained in circulation for at least half a year.  No repeat challenges to the Subject Books have been received or entertained—indeed, as previously noted, some have been voluntarily withdrawn. The mere fact that the Board may not ultimately follow the recommendation of the review committee does not automatically result in the inference that the Board gave the recommendation no consideration.  The mere fact that the District may have deemed certain books educationally suitable in the past does not bar the District from later declining to retain it, just as the District's removal of a book from its shelves does not taint the decision to return the book in the future upon further consideration.

Plaintiffs make repeated references to the purported statements and views of No Left Turn in Education and Andy Wells, but fail to provide any evidence indicating these were also the views of the book challengers and Board members *in this case*, instead relying on speculative conspiratorial allusions and tenuous unspoken insinuations.[16]  Plaintiffs go so far as to seemingly imply that Andy Wells himself submitted challenges to one or more of the Subject Books (*see* Doc. 19, p. 13), which has not been substantiated.  Moreover, regarding the purported personal statements of Ms. Crawford and Director Garber cited by Plaintiff (and the District seriously questions the animus Plaintiffs attempt to conjure from their words), the animus Plaintiffs infer is

---

[15] The District further notes that half of the Subject Books (*Gabi*, *Invisible Girl*, *Modern Romance*, and *Heavy*) are not named on the challenge list (Doc. 19-27).

[16] Plaintiffs' reliance on Mr. Graff's Declaration (Doc. 19-35) is equally misguided.  Beyond the fact his declaration provides no factual foundation of personal knowledge for the sweeping legal conclusions and gross generalizations asserted, his claims regarding state or national-level trends in book challenges are just that—purported trends with no demonstrated bearing on the specific facts at issue here.  (*See id.*).

clearly not reflected in the reasons expressed in the actual challenges at issue and obviously cannot be imputed to the Board itself.[17]  With respect to Director Garber, for all of Plaintiffs' accusations of animus against minorities, she voted to retain *Gabi*.  (*See* Doc. 6, ¶ 100).  Plaintiffs also imply that Ms. Crawford's book challenges were not sincere or not sufficiently meritorious even though they included specific reasons and specific excerpts for her objections (none of which were predicated upon race or sexual orientation).  (*See* Doc.'s 16-20).  Plaintiffs complain that Crawford's objections did not consider the challenged books as a whole, but this is again pure speculation.

Finally, this case is not as factually analogous to *Pico* as Plaintiffs suggest.  There, the defendant board members were alleged to have obtained a list of objectionable books from a politically conservative conference and then proceeded to remove any of the listed books in its schools *ad hoc*.  457 U.S. at 856-57.  Here, while Plaintiffs have presented a list, there is no evidence that said list was disseminated to the Board, much less that the Board removed or voted to remove any of the Subject Books on the basis of such a list.  Again, other books on the purported challenge list have remained on District library shelves without challenge or restriction in spite of the supposed concerted effort to target minority viewpoints at the District.

> b.      *The Bluest Eye*.

Plaintiffs' insinuations that the District's Board did not substantively consider the challenge to *The Bluest Eye* and then disregarded the committee report out of hand simply do not square with reality.  The Board received the committee report prior to its January 20, 2022 meeting.  (*See* Doc. 19-14).  At the meeting, Board members discussed the challenge for nearly half-an-hour before voting to not retain *The Bluest Eye*—considering less restrictive alternatives, reciting portions of

---

[17] *See* District Policies 0310 (Exhibit B) and 0340 (Exhibit I) (the Board can only take official action while acting as whole).

the committee report, and ultimately expressing concerns regarding the maturity level, academic value, potential obscenity, and "play-by-play" graphic sexual content of the book.  January 20, 2022 Meeting, https://bit.ly/36vooWK at 2:55:13-3:19:05.  Plaintiffs and their "experts" are free to conclude that *The Bluest Eye's* overall educational value unquestionably outweighed its graphic content and that the Board should have initially followed the committee's recommendation. However, their mere dissatisfaction (or even reasoned dissent) is not enough to impute viewpoint discrimination to the Board or overcome the Board's broad discretion in determining the educational suitability of the content in its libraries.  Plaintiffs' suggestion that the NCAC and MLA-IFC letters (Doc.'s 19-44 and 19-45) constitute proof that the Board maintained its removal of *The Bluest Eye* in bad faith is completely baseless.  First of all, there is no evidence that the Board disregarded the correspondence out of hand.   Again, Plaintiffs are not entitled to a preliminary injunction simply because they disliked the Board's ultimate decisions and conclusions.  Second, and more importantly, Plaintiffs have pointed to no authority holding that the District or the Board was in any way obligated to accept the legal conclusions and blanket assertions of these letters as authoritative fact.  The same is true of Dr. Dawkins' opinions regarding the general appropriateness of the Subject Books in the school settings.  (Doc. 19-26).

### ii.   The District's policy of temporarily removing books pending committee review is not unconstitutional.

#### a.   The District has not created a "heckler's veto."

The "heckler's veto" scenario contemplates a situation where the government silences a speaker to appease the crowd and stave off a potentially violent altercation. *Forsyth Cty. v. Nationalist Movement,* 505 U.S. 123, 134-35 (1992)*; Bible Believers v. Wayne Cty.*, 805 F.3d 228, 234 (6th Cir. 2015).  Again, the District does not see what actual student speech has been silenced when it temporarily or permanently removes one of its own books from its

shelves.   Moreover, Plaintiffs have not demonstrated that any book removal (temporary or otherwise) has been motivated by some reactionary fear or pressure arising from the anticipated disruption by a hostile mob in response to "speech"—the removals occurred pursuant to longstanding policy.  Plaintiffs' reliance on *Sund v. Cty. of Witchita Falls*, 121 F. Supp 2d 530, 549 (N.D. Tex. 2000), is misplaced.  Unlike the procedure at issue in *Sund*, the submission of a formal challenge under District policy is not the end-all-be-all as to its status and the accompanying temporary cessation of access is not a judgement of the material's acceptability—again the purpose is for the District, via committee and board vote, to review the material in accordance with its policies and educational mission.  This not only distinguishes this case from *Sund*, but from the other book removal decisions Plaintiffs rely upon as well.  Perhaps more importantly, the court in *Sund* addressed restrictions for a <u>public</u> library and specifically made the distinction that <u>public school</u> libraries have "inculcative" functions not possessed by public libraries.  *Id.*

*b.      District has not imposed an unconstitutional prior restraint.*

"The special vice of a prior restraint is that **communication** will be suppressed, either directly or by inducing excessive caution in the **speaker**, before an adequate determination that it is unprotected by the First Amendment."  *Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations*, 413 U.S. 376, 390 (1973) (emphasis added).  Here again, the District reiterates it has not prohibited any expressive conduct by Plaintiffs—at most the District has declined to engage in the speech Plaintiffs apparently seek to compel (*see* Doc. 6, ¶ 127).  Additionally, the District notes that, in a number of Plaintiffs' relied upon authorities, at issue was insufficient notice of what speech the restraint made punishable (*see e.g.*, *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70-71 (1963)), and all of the cases involved restrictions on expressive conduct outside of the unique school context—annoying other people

on a sidewalk or street corner, marching in parades, gathering in assemblies, holding demonstrations, issuing publications, etc. (*see* Doc. 19, p. 10).  Here, Plaintiffs are not compelled to discern whether expressive conduct is or is not prohibited under the threat of punishment.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

As Plaintiffs have not fulfilled their burden to establish a sufficient likelihood of a Constitutional violation, they cannot demonstrate any irreparable harm arising from the same. Even accepting Plaintiffs' claims at face value, their Motion still fails to show any credible threat of irreparable harm in the absence of a preliminary injunction.  Again, Minor Plaintiff D.L. attests that he is currently not able to check out any additional District library books and seems to suggest this will remain the case for some time.[18]  (*See* Doc. 19-29, ¶¶ 6, 11-13).  Thus, there is no evidence before the Court that he would be able to check out any of the Subject Books even if some of them were not temporarily unavailable due to District policy.[19]  No declaration by Minor Plaintiff C.K.-W. has been presented.  Rather, *her parent*, T.K. (who is not an individual plaintiff in this action), merely attests that T.K. would like C.K.-W. to have access to the Subject Books via the District's libraries—there are no facts indicating that C.K.-W. herself currently has any intent or ability to check out any of the books.  (*See* Doc. 19-31, ¶¶ 2, 4).  Finally, even assuming *arguendo* the existence of irreparable harm, Plaintiffs' request that the Court enjoin the District from even receiving, reviewing, or voting upon any pending or future book challenges (*see* Doc. 11) is categorically overbroad and excessive.  There is no legal or factual basis for such a prohibition.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR DEFENDANTS

---

[18] It is also worth noting that Plaintiff D.L. is a graduating senior.  (Doc. 19-29, ¶ 3).

[19] Plaintiff D.L.'s Declaration merely claims that he wants to check out unidentified "other books that have been challenged and banned."  (Doc. 19-29, ¶ 5).

As demonstrated above, Plaintiffs have not shown a fair chance of prevailing on the merits in this matter nor irreparable harm in the absence of relief.  Even the plurality in *Pico* acknowledged that public school districts have wholly legitimate grounds for shielding their students from vulgar or educationally unsuitable library content outside of the curricular context. 457 U.S. at 871.  While Plaintiffs and their "experts" might believe that the educational value of the Subject Books is beyond any question or debate irrespective of student age and maturity, that alone is simply not enough to subsume the judgment and discretion of the District's democratically elected (and accountable) Board, much less deprive the District of the opportunity to assess the suitability of its library books at all.  Thus, given that what is seen cannot be unseen, the balance of equities and the public interest under the specific facts of this case plainly weigh against the extraordinary remedy of a preliminary injunction that would unduly interfere with, and irrevocably prejudice, the District's broad and substantial discretion to inculcate community values in its schools and safeguard the wellbeing of all of its students.

## Conclusion

Plaintiffs' Motion for Preliminary Injunction wholly fails to demonstrate that Plaintiffs are likely to prevail on the merits, that Plaintiffs will be irreparably harmed, or that the balance of equities or the public interest favors Plaintiffs.  For all of the reasons above, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted,

EDCOUNSEL, LLC

By: */s/ J. Drew Marriot*
    J. Drew Marriott, #63059
    dmarriott@edcounsel.law
    Matthew D. Wilson #59966
    mwilson@edcounsel.law
    2833B E. Battlefield St., Ste. 100

Springfield, Missouri 65804
(417) 755-7190
(855) 876-4740 (facsimile)
ATTORNEYS FOR DEFENDANT

Dated: March 28, 2022