**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| C.K.-W., *by and through her parent T.K.,* *individually and on behalf of those* *similarly situated,* et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 4:22-cv-00191-MTS |
| WENTZVILLE R-IV SCHOOL DISTRICT, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction, Doc. [11].  Plaintiffs seek to enjoin Defendant, the Wentzville R-IV School District, from following its policy that allows parents, guardians, and students to initiate challenges to library materials, and Plaintiffs also ask the Court to require the District to restore access to any books it has removed from school libraries during the most recent school year.  For the reasons the Court will explain herein, Plaintiffs have failed to show that the relevant factors weigh in favor of a preliminary injunction in this case, and the Court therefore will deny the Motion.

I.      **Background**

Plaintiffs' characterization[1] of this case makes it important at the outset for the Court to clarify something: this case does not involve banning books.  The District has not banned the books at issue here, and, despite repeatedly calling this a case on book bans, Plaintiffs make no factual allegations about anyone banning any books.  Nowhere do Plaintiffs allege that the District has prohibited anyone from reading, owning, possessing, or discussing any book.

---

[1] *See, e.g.*, Doc. [6] (Plaintiffs referencing the "Banned Books" in this case no fewer than thirty-five times); Doc. [11] (seeking an injunction that will prohibit Defendant "from temporarily or permanently banning additional books").

Rather, through a policy enacted by its elected school board, the District allows librarians to use their best judgment to remove books in select scenarios, and, through another policy, the District temporarily has removed a limited number of other books while it determines their propriety for inclusion in the District's libraries.

The District's policy does *not* ban the District's students from reading the books at issue here.  Nor does it ban students from acquiring the books or lending the books to others.  Students may borrow the books from the public library or from a friend or neighbor.  They likewise are free to purchase the books.  The policy does not even ban students from bringing the books at issue to the District's schools.  Nor does it ban students from discussing the books at school during their free time or encouraging others to read them.

It simply does not ban the books, or anything for that matter.  So, the "overwrought rhetoric about book banning has no place" in this case.  *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1218 (11th Cir. 2009); *cf. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) (principal case on which Plaintiffs rely that, despite similar facts, does not use the word *ban* or any similar language to describe the board's actions).  A school district does not "ban" a book when, "through its authorized school board," it "decides not to continue possessing [a] book on its own library shelves."  *Miami-Dade Cnty. Sch. Bd.*, 557 F.3d at 1218.

Having discussed what the policies at issue here do *not* do, the Court now examines how the policies here actually operate.  Two policies of the District, enacted by its elected school board, are chiefly at issue in this case.  Board Regulation 6310 ("6310") provides that "access to library/media materials will be based upon the contribution to the education program and the age appropriateness of the materials."  Doc.  [19-3].  It allows librarians in the District to withdraw

and discard materials that are "soiled, damaged, or torn beyond repair," materials that "exceed[]
age sensitivity," and materials that "contain unreliable information."  Doc. [19-2].

Another Board Regulation provides an alternative avenue by which materials can be
removed from District libraries.  Board Regulation 6241 ("6241") recognizes that "honest
differences of opinion may arise about books or materials used in public schools."  Doc. [19-5].
To that end, 6241 provides a process for the "impartial and orderly" evaluation of complaints the
District receives[2] to a specific book or other "material."  Doc. [19-5].  After a principal receives
a complaint, 6241 provides that the book will be "removed from use, pending committee study
and final action by the Board of Education, unless the material questioned is a basic text."  Doc.
[19-5].  Within fifteen days of receiving the complaint, the Superintendent of Schools appoints a
nine-person "review committee" that must consist of an administrator of the building involved,
three teachers, a member of the Board of Education, and four "lay persons."  *Id.*

Within twenty days of the appointment of the review committee, 6241 provides the
committee must meet, review the written request for reconsideration, read the questioned
materials, evaluate, and prepare a written report of its findings and recommendations to the
Superintendent of Schools wherein the committee may recommend the material be retained
"without restriction," retained "with restriction" or not retained.  *Id.*  At the next meeting of the
locally elected, publicly accountable Board of Education, the Superintendent will report the
committee's recommendation to the Board, which then makes the "final" decision on whether to
retain the material.  *Id.*  The principal of the school will then "see that the decision of the Board
is carried out."  *Id.*

---

[2] Board Regulation 6310 references that "[s]tudents or parents/guardians" may file a complaint under 6241, but 6241
itself does not appear to limit it to students, parents, or guardians.  However, beyond the limited questions of
whether the policies at issue violate a federal statutory or constitutional right, it is entirely the province of the
Defendant to interpret its policies.

Eight books are at issue in this case. They are: *Modern Romance*, by Aziz Ansari; *Fun Home: A Family Tragicomic Paperback*, by Alison Bechdel; *Lawn Boy*, by Jonathan Evison; *Invisible Girl*, by Lisa Jewell; *All Boys Aren't Blue*, by George M. Johnson; *Heavy: An American Memoir*, by Kiese Laymon; *The Bluest Eye*, by Toni Morrison; and *Gabi, A Girl in Pieces*, by Isabel Quintero. All eight of these books, according to Plaintiffs, feature and present the perspective of an author or protagonist who is "non-white, LGBTQ+, or otherwise identifies as a minority." Doc. [6] ¶ 49. And all eight books received at least one complaint pursuant to 6241. Six of the eight books currently are not available at District libraries. Three of them—*Fun Home*, *All Boys Aren't Blue*, and *Heavy*—were removed by librarians under 6310 after the District received a complaint under 6241. Recall that 6310 allows the librarian to remove materials that exceed age sensitivity. Four other books—*Lawn Boy*, *Gabi, A Girl in Pieces*, *Modern Romance*, and *Invisible Girl*—were removed from District libraries <u>temporarily</u> pursuant to 6241 while the books are reviewed under the policy. Of those four, three are still in review and, pursuant to 6241, remain temporarily unavailable in District libraries. *Gabi, A Girl in Pieces*, completed the 6241 process and is now back in District libraries.

Plaintiffs focus much of their attention on the District's actions regarding the eighth book at issue, *The Bluest Eye*. *See, e.g.*, Doc. [6] ¶¶ 30–38, 55–75. After the District received a complaint regarding *The Bluest Eye* pursuant to 6241, the District followed its usual process. The committee it formed recommended to retain the book, but the School Board voted on January 20, 2022, that it should not be retained. Just weeks later, on February 25, 2022, the Board rescinded its initial decision to remove *The Bluest Eye*, and it is now allowed to be within the District's libraries. Doc. [19] at 4. Consequently, the elected Board of Education has not permanently removed any books from District libraries under 6241. In fact, it explicitly has

allowed the two that have completed the review process to remain.  The only books indefinitely removed from the District's libraries were the three books that librarians deemed warranted removal under 6310.

Plaintiffs allege that the removal of books from the District's libraries is "part of a targeted campaign" by two private groups "to remove particular ideas and viewpoints about race and sexuality from school libraries," Doc. [6] ¶ 103, and that the District's "failure to use established, regular, and facially unbiased procedures for the removal of books" and its "policy of removing materials immediately upon challenge demonstrates that the [materials] have been removed on an arbitrary basis and not in a viewpoint-neutral manner," *id.* ¶ 110.  Plaintiffs assert that the District removed the books "with the intent and purpose of preventing all students from accessing" them, and they allege the "decisive factor" in the decision to remove the books was a "dislike of the ideas or opinions contained in the books by policymakers, school officials, community members, or a combination of those."  *Id.* ¶ 124–25.  They contend the policies themselves and the removal of the books at issue violate the First Amendment rights of students "by restricting their access to ideas and information for an improper purpose."  *Id.* ¶ 129.  Plaintiffs seek to enjoin Defendant, the Wentzville R-IV School District, from following its policy that allows parents, guardians, and students to initiate challenges to library materials and require the District to restore access to any books it has removed from school libraries during the most recent school year.

II.     **Discussion**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  And given that Plaintiffs here seek to enjoin the policies of a locally elected board of education, this federal Court should exercise

- 5 -

careful attentiveness before awarding this already extraordinary remedy given that education is a core state function. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges."); *Missouri v. Jenkins*, 515 U.S. 70, 99 (1995) (noting that because "local autonomy of school districts is a vital national tradition," a "district court must strive to restore state and local authorities to the control of a school system operating in compliance with the Constitution" (citations omitted)); *Id.* at 131–32 (Thomas, J., concurring) ("State and local school officials not only bear the responsibility for educational decisions, they also are better equipped than a single federal judge to make the day-to-day policy, curricular, and funding choices necessary to bring a school district into compliance with the Constitution."); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207 (1982) ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States."); *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 410 (1977) ("[L]ocal autonomy of school districts is a vital national tradition."); *Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 399 (5th Cir. 2013) (per curiam) (noting that a federal court enjoining a state from implementing its own education law "invokes significant concerns related to principles of federalism and comity").

With that principle in mind, the Court will examine the standard four factors used to determine whether to issue a preliminary injunction in this case. These four factors are: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other litigants; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). As the parties seeking injunctive relief, Plaintiffs bear

the burden of establishing the propriety of such relief. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011).

      *a.  Likelihood of Success on the Merits*

      "While no single factor is determinative" in the preliminary injunction analysis, "the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotations and citations omitted). So, the Court will begin its analysis there. Plaintiffs assert that they need only show that they have a "fair chance" of prevailing on the merits, a less rigorous showing than the "likely to prevail on the merits" showing, which is required when a party seeks to enjoin "government action based on presumptively reasoned democratic processes." *See Planned Parenthood Minn., N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc); *see also* Doc. [19] at 7. At issue here, however, are policies enacted by a democratically elected board of education. Nevertheless, the District does not argue that the more rigorous "likely to prevail on the merits" showing should apply here; that is, the District does not argue that its school board's policies constitute government action based on presumptively reasoned democratic processes. Doc. [28] at 4. Perhaps Plaintiffs are correct. *See Brooks v. Francis Howell Sch. Dist.*, --- F. Supp. 3d. ---, 4:22-cv-00169-SRC, 2022 WL 1185147, at *5 (E.D. Mo. Apr. 21, 2022) (using "fair chance" analysis after concluding school board's action did not involve "the full play of the democratic process"); *but see S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 775 (8th Cir. 2012) (noting district court observed that plaintiff "needed to show a 'fair chance' of success on the merits" in challenge to a school district policy but otherwise not discussing "fair chance" and simply concluding that plaintiffs were "unlikely to succeed on the merits"); *Kroupa v. Nielsen*, 731 F.3d 813, 815, 818 (8th Cir. 2013) (emphasizing that the "secret deliberations" of a

"secret" and "undisclosed" committee of a state university were not government action based on presumptively reasoned democratic processes); *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1001 (8th Cir. 2019) (using "fair chance" analysis in challenge to by-laws of a state's high school athletic league because "the full play of the democratic process" was not involved in creating the by-laws since they were "created by League-member schools throughout the state, not by democratically elected officials who must answer to their constituents or face the possibility of not being reelected").

Because the District did not argue for the "likely to prevail on the merits" standard, beyond a mere passing reference to it in a heading, and because the Court concludes that Plaintiffs do not meet even the less rigorous "fair chance of prevailing" standard, the Court will use "fair chance" standard without deciding which standard should apply here.  *See Rounds*, 530 F.3d at 736 (noting that movant could not meet "even the less rigorous requirement to show a fair chance of prevailing, much less the more rigorous requirement . . . that it is *likely* to prevail, on the merits of its claim"); *Barrett v. Claycomb*, 705 F.3d 315, 321 n.4 (8th Cir. 2013) (refraining from resolving which standard applied in case challenging policy implemented by a state college because the court would reach the same conclusion regardless of the standard applied).  Accordingly, on this factor, the Court must determine whether Plaintiffs have shown that they have a "fair chance of prevailing" on the merits of their claim.

### i. Fair Chance of Prevailing on the Law

For Plaintiffs to have a fair chance of prevailing on their First Amendment claim, the First Amendment would need to prohibit public school officials from removing a limited amount of books from their library shelves or the First Amendment would need to prohibit public schools from temporarily removing books from their library shelves while they determine the

books' suitability.  Plaintiffs have not coherently explained how the First Amendment prohibits either.  Nor does the Court find the law supports their arguments.

Plaintiffs rely heavily on the plurality opinion of Justice Brennan in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, a case that sharply divided the Supreme Court and that produced seven opinions, none of which garnered a majority.  457 U.S. 853 (1982).  Justice Brennan's plurality opinion, "a lavish expansion going beyond any prior holding under the First Amendment, expresse[d] its view that a school board's decision concerning what books are to be in the school library is subject to federal-court review."  *Pico*, 457 U.S. at 885 (Burger, C.J., dissenting, joined by Powell, Rehnquist, and O'Connor, JJ.).[3]  Justice Brennan's plurality opinion in *Pico*, however, is not binding.  *See Jones v. Jegley*, 947 F.3d 1100, 1106 n.3 (8th Cir. 2020); *see also Pico*, 457 U.S. at 885 (Burger, C.J., dissenting) ("Were [the plurality opinion] to become the law . . . .").

Indeed, it is not clear what, if anything, from *Pico* is binding on the case here.  *See Griswold v. Driscoll*, 616 F.3d 53, 57 (1st Cir. 2010) (Souter, J.) (describing *Pico*'s "rule of decision" as "unclear").  To determine what is binding from *Pico*, it is necessary to determine the "position taken by those Members who concurred in the judgments on the narrowest grounds." *Jones*, 947 F.3d at 1106 n.3 (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)).  Justice White's opinion therefore controls.  *See Pico*, 457 U.S. at 883 (White, J., concurring in the judgment); *see also Griswold*, 616 F.3d at 57 (explaining "Justice White concurred in [*Pico*'s] judgment without announcing any position on the substantive First Amendment claim"); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (en banc) (finding Justice White's opinion had the narrowest grounds for the judgment and therefore concluding the

---

[3] Though of no precedential significance, Chief Justice Burger's dissent, which three other Justices joined in full, had more votes than any opinion affirming the judgment, including Justice Brennan's plurality opinion.

Court did not decide the "extent" or even the "existence" of "First Amendment implications in a school book removal case").

Justice White affirmed the judgment below because he was "not inclined to disagree with the Court of Appeals" that a material issue of fact precluded summary judgment. *See Pico*, 457 U.S. at 883 (White, J., concurring in the judgment).  That material issue of fact was "the reason or reasons underlying the school board's removal of the books." *Id.*  He wrote that while the Justice Brennan plurality "seem[ed] compelled" to "issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library," he would not reach that constitutional question until it was "necessary to do so." *Id.* at 883–84.  At *most*, Justice White's concurrent position suggests it is conceivable that the First Amendment imposed some degree of limitations upon the discretion of the removal of books from a public-school library.  That conclusion, however, is hardly earth shattering. *See Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting, joined by Burger, C.J., and Powell, J.) ("cheerfully conced[ing]" that some "extreme examples" would violate the Constitution, like, for instance, where a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans).

Shortly before the Supreme Court issued its judgment in *Pico*, the Court of Appeals for the Eighth Circuit decided *Pratt v. Independent Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982) (Heaney, J.), wherein it held that a school board could not constitutionally ban films from its curriculum because "a majority of its members object to the films' religious and ideological content and wish to prevent the ideas contained in the material from being expressed in the school."[4]  This conclusion that it violates the First Amendment if a school board

---

[4] The *Pratt* decision, at best, has limited utility to this case.  Even the Justices voting in the majority in *Pico* rejected the idea central to *Pratt*, that a federal court could review and countermand the curriculum decisions of local school

removes materials *because* they disagree with them is in tune with Justice Brennan's plurality

opinion in *Pico*.[5]  At this stage of the litigation, the Court will proceed under Justice Brennan's

approach, the most expansive view of the purported right at play—even though the Court has

serious reservations on the propriety of that approach.

Even using this most expansive view of the purported right at play, this First Amendment

right to receive ideas, Plaintiffs here have a narrow path.  *See Pico*, 457 U.S. at 867 (Brennan,

J.); *see also id.* at 910 (Rehnquist, J., dissenting) (noting the plurality opinion placed

"limitations" on the right it recognized demonstrating even it had "discomfort with the new

doctrine [that it] fashion[ed] out of whole cloth").  The *Pico* plurality recognized local school

boards have "a substantial legitimate role to play in the determination of school library content"

and that districts have "significant discretion" to determine the books available in school

libraries.  *Id.* at 869–870.  The discretion, though, "may not be exercised in a narrowly partisan

or political manner."  *Id.* at 870.  The central issue, according to the plurality, was the

"motivation behind" the action.  *Id.* at 871.  Only if the officials "intended by their removal

decision to deny [students] access to ideas with which [the officials] disagreed, *and* if this intent

---

authorities.  *See Pico*, 457 U.S. at 869 (plurality) ("Petitioners might well defend their claim of absolute discretion in matters of curriculum by reliance upon their duty to inculcate community values."); *id.* at 881–82 (Blackmun, J., concurring in part and concurring in the judgment) (describing a school board's "absolute discretion to choose academic materials" and their "authority to make educationally appropriate choices in designing a curriculum"). The *Pratt* decision has not aged well in the forty years of First Amendment jurisprudence since its issuance.  *See, e.g.*, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), *rev'g*, 795 F.2d 1368, 1370 (8th Cir. 1986) (Heaney, J.); *see also, e.g.*, *Griswold v. Driscoll*, 616 F.3d 53, 59–60 (1st Cir. 2010) (Souter, J.) (explaining that there was "no denying that the State Board of Education may properly exercise curricular discretion" without implicating the First Amendment "even if" changes to curriculum were "made in response to political pressure"); *Chiras v. Miller*, 432 F.3d 606, 619 (5th Cir. 2005); *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998) (en banc) ("we are of opinion that plaintiff had no First Amendment right to insist on the makeup of the curriculum").

[5] In *Pratt*, the court opined that the case could not "be distinguished on a principled basis from" First Amendment challenges to the removal of books from school libraries.  670 F.2d at 776 n.6.  Indeed, *Pratt* relied heavily on the opinions from *Pico* when it was before the Court of Appeals for the Second Circuit.  *See Pico v. Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404, 406 (2d Cir. 1980); *id.* at 432 (Newman, J., concurring in the result).

- 11 -

was the *decisive factor* in [their] decision" does the removal violate the First Amendment. *Id.* (emphasis added); *accord Pratt*, 670 F.2d at 778 (finding students "had a right to be free from official conduct that was *intended* to suppress the ideas expressed in" the materials (emphasis added)).

This *mens rea* requirement necessarily means schools may remove books for numerous reasons. Indeed, if an intent to deny must be the *decisive* factor, schools may even remove books *partly* because they intend to deny students access to ideas with which they disagree. The *Pico* plurality specifically pointed to two plainly proper reasons for removing books. It explained that school officials certainly may remove books based on the books' "educational suitability" or if the books are "pervasively vulgar." *Pico*, 457 U.S. at 871.

ii.  <u>Fair Chance of Prevailing on the Facts</u>

Plaintiffs have not shown that the facts in this case give them a fair chance of prevailing, even under the legal framework most favorable to them of the *Pico* plurality and *Pratt*. Plaintiffs have provided only rank suspicion to try to show that the District intended to deny students access to ideas with which the District disagreed, let alone that that intent was the *decisive* factor in decision.

*First*, the District has decided to remove only three books at issue here from its libraries indefinitely. These three books that actually have been removed indefinitely—that is, removed under 6310 and not just temporarily removed for review under 6241 pending a final determination—were removed pursuant to a policy that allows materials that exceed "age sensitivity" to be removed. Doc. [19-2]. Plaintiffs have not provided any evidence that the removal of these three books was a pretense and that the true *decisive* factor regarding removing the books was to deprive students of the ideas contained within them. All Plaintiffs can muster

- 12 -

regarding these three books is that, on "information and belief," the "ordinary course and procedures for the consideration of weeding" were not followed.  Doc. [6] ¶ 84.

Besides necessarily allowing for the removal of books from a public school's library for any number of reasons, the entire *Pico* Court was unanimous in its explicit conclusion that schools can remove books based on their vulgarity.  *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986) (noting that, although the Court was "sharply divided" in *Pico*, all Members of the Court "acknowledged that [a] school board has the authority to remove books that are vulgar").  No one seriously could dispute that a school may seek to keep vulgar materials away from its students.  *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2063 (2021) (Thomas, J., dissenting) ("Nobody doubts, for example, that a school has *in loco parentis* authority over a student (and can discipline him) when he passes out vulgar flyers on campus[.]").  Likewise, it is "perfectly permissible" for a school to remove a book based upon the book's "educational suitability."  *Pico*, 457 U.S. at 871.  A book's vulgarity and its educational suitability surely are at the heart of the determination of the "age sensitivity" consideration, which 6310 allows District librarians to make to remove a book.  *See* Doc. [10]. Plaintiffs, apparently, would have this single federal judge evaluate whether the books are educationally suitable or sufficiently vulgar to remove, never mind the fact that the school librarians—whose expertise on this matter outpaces this Court's and who are accountable to the locally elected school board—concluded they should be removed.  Perhaps one could think of extreme hypotheticals where a district's claimed assertion of a book's vulgarity was plainly a pretense, where every reasonable person would conclude that a book was not vulgar and was age appropriate.  *See Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting); *cf. Sisney v. Kaemingk*, 15 F.4th 1181, 1193 (8th Cir. 2021) (upholding prison's censorship of erotic novels but not

censorship of classic artworks, such as Michelangelo's 'David,' where prison officials presented no evidence of a rational relationship between the classic artwork ban and legitimate government interests such as security and rehabilitation), *cert. denied*, 142 S. Ct. 1454 (2022).  But, here, it is quite easy to see why a librarian would conclude the three books at issue should be removed based on age sensitivity given each has lascivious content.

*Fun Home*, for example, has entire illustrated pages showing characters engaging in oral sex along with accompanying ribald language.  Doc. [2] at 214; *see also id.* at 80–81 (showing various detailed illustrations of two undressed individuals in bed together with the narrator explaining that she "spent very little of the remaining semester outside her bed").  *All Boys Aren't Blue* vividly describes multiple sexual encounters of the author.  *See* Doc. [3].  "He reached his hand down and pulled out my dick.  He quickly went to giving me head. . . .  [W]e dry humped and grinded. . . .  I put some lube on and got him up on his knees, and I began to slide into him from behind. . . .  I eased in, slowly, until I heard him moan. . . .  I finally came and let out a loud moan—to the point where he asked me to quiet down for the neighbors.  I pulled out of him and kissed him while he masturbated.  Then, he also came."  *Id.* at 266–268.  *All Boys Aren't Blue* details another encounter.  "[H]e told me to lie down on the bed.  He asked me to 'turn over' while he slipped a condom on himself. . . .  [T]his was my ass, and I was struggling to imagine someone inside me.  And he was . . . large.  But I was gonna try."  *Id.* at 270–71 (second ellipsis in original).

In keeping with the pattern, *Heavy: An American Memoir* likewise has detailed accounts of sexual encounters.  The book does not attempt to hide its contents.  As the back cover explains, the book discusses the author's "complex relationship with his family, weight, sex, gambling and writing."  Doc. [4].  The author writes that "Renata pulled up her shirt, unhooked

her bra, and filled my mouth with her left breast. . . .  Choking on Renata's breasts made me feel lighter than I'd ever felt.  After a few minutes, Renata grabbed my penis and kept saying, 'Keep it straight, Kie.  Can you keep it straight?'"  *Id.* at 22–23.  And elsewhere, "I got close enough to the door to see Delaney was standing in the middle of the room with his soggy maroon swim trunks around his calves.  Dougie was on his knees in front of Delaney with his hands behind his back.  His tongue was out, licking the tip of Delaney's penis."  *Id.* at 40.

Could a librarian or, ultimately, a school board official conclude that these books were age suitable for some older students and that the books merited inclusion based on their content overall?  Sure.  But can this Court conclude that the librarian's determination that these books were not age appropriate was a pretense, absent some actual evidence, and that the real *decisive* reason for the removal was to deny access to students of certain ideas?  Not at all.  But Plaintiffs make the sweeping and, frankly, disconcerting request to have this Court require that the District "restore access" to these three books and "*any* books that were removed from school libraries during this school year and for which access has not been restored."  Doc. [19] at 17 (emphasis added).  Meaning Plaintiffs would have this Court force the District to provide access to these, or any other books, that the District's librarians concluded were appropriate for removal no matter the reason.  Even if one of these books, or another that was even more sexually explicit, had been available to a library that served third graders, either inadvertently or because the librarian was unaware of the content, Plaintiffs would have this Court order the District to return the book for the third graders to read.

Plaintiffs also have failed to show they have a fair chance of success on their argument that 6241 itself is constitutionally infirm.  Schools may remove books from their libraries for a multitude of reasons.  It necessarily follows, then, that schools may have policies that allow for

- 15 -

the removal of books and policies on determining whether and when books should be removed. Their decisions on how and when to remove books is entitled to substantial deference. *See Kuhlmeier*, 484 U.S. at 273.  The idea that the District's policy set out in 6241—the policy to temporarily remove a book upon receipt of a complaint until the District determines whether to retain the book—is somehow unconstitutional is not consistent with *Pico*.

The *Pico* plurality recognized an amorphous, but circumscribed, right to receive information in a school setting, but it tied the scope of the right exclusively to the conduct of the school officials.  School officials cannot remove materials if the *decisive* factor for the removal was to deny students access to ideas.  *Pico*, 457 U.S. at 871 ("[W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions.").  A policy that requires the temporary removal of *any* material anytime the District receives a complaint (which people of any race, religion, gender, sexual orientation, and political or world view may file) necessarily would *not* impute a motive on the District.  When the District temporarily removes all complained-of books, and does so evenhandedly, it necessarily cannot be removing them with the intent to deny students access to ideas with which the District disagrees.

Plaintiffs offer two theories on how the policy is unconstitutional.  They argue it creates "an official heckler's veto" and that it amounts to an "unconstitutional prior restraint."  *See* Doc. [19] at 9–10.  Both arguments miss the mark.  Both a heckler's veto and a prior restraint involve the freedom of speech and expression, not the right of access to particular ideas.  Neither concept translates well from the freedom of speech and expression arena to this right of access to particular ideas.

- 16 -

A heckler's veto is the "government's restriction or curtailment of a speaker's right to freedom of speech when necessary to prevent possibly violent reactions from listeners." *Heckler's Veto*, *Black's Law Dictionary* (11th ed. 2019); *accord Roe v. Crawford*, 514 F.3d 789, 796 n.3 (8th Cir. 2008) (describing it as "situations in which the government attempts to ban protected speech because it might provoke a violent response"). Plainly, that is not what is happening here. This is the case of the government (in the form of a school district) temporarily removing access to particular materials to determine whether they are appropriate for children. In doing this, it is not banning protected speech. And no one argues it removed these books because it feared they would provoke a violent response. This is not a case of a heckler's veto.

Nor is the District's policy an unconstitutional prior restraint. "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotations omitted). Once again, that plainly is not this policy. This policy does not prohibit communications. True, at issue here is the First Amendment, which provides for the freedom of speech. But at issue here is the amorphous right of students to receive information, which has been synthesized from the First Amendment as an "inherent corollary of the rights of free speech and press." *Pico*, 457 U.S. at 867. Here, the District is not forbidding anyone from any speech, and Plaintiffs provide no precedent or coherent argument why a prior restraint—and a temporary one, at that—on a student's right to access information in the form a particular book or material would violate the First Amendment. And even if this policy were a prior restraint, Plaintiffs have not demonstrated why it would be unconstitutional, as prior restraints on speech are not always unconstitutional in a public school

- 17 -

setting.  *Kuhlmeier*, 484 U.S. at 268–69; *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1134 (8th Cir. 1999).

Plaintiffs have failed to show they have even a fair chance of succeeding in this case on the merits.  That conclusion weighs against them heavily.  *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) (explaining "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied").

      b.  *Remaining* Dataphase *Factors*

Even when a plaintiff has "a strong claim on the merits," which the Court concludes is not the case here, a plaintiff's likelihood to succeed "must be examined in the context of the relative injuries to the parties and the public."  *Roudachevski*, 648 F.3d at 705.  "[A] preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits, even in First Amendment cases, and the district court must still consider the other factors . . . ."  *Rodgers v. Bryant*, 942 F.3d 451, 466 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part) (internal citations and quotations omitted).  The Court concludes that Plaintiffs have not shown the remaining factors weigh in favor of a preliminary injunction here.

      i.  <u>Irreparable Harm</u>

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (citing *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012)).  As courts have said time and again, the loss of First Amendment freedoms for even minimal amounts of time irreparably injures.  *See, e.g.*, *Powell*, 798 F.3d at 702.  Here, though, the Court already

- 18 -

concluded that Plaintiffs do not have a fair chance of succeeding in showing that the District violated their First Amendment rights. This conclusion correspondingly weakens Plaintiffs' threat of irreparable harm in comparison to Defendant's and the public's interest, whatever the degree of the irreparable injury even would be here. *Id.*; *Rounds*, 530 F.3d 724, 738 n.11 (8th Cir. 2008) (explaining that "without a showing that it will likely prevail on its claim," a plaintiff's "asserted threat of irreparable harm is correspondingly weakened").

Besides the irreparable harm being weakened here because of the conclusion that Plaintiffs have not established a fair chance of success on the merits, the Court concludes that even if Plaintiffs were to succeed on their claim that the District's policy or actions violate the First Amendment, their harm would not be especially great, at least compared to a prototypical First Amendment violation. The removal of the books at issue from the District's schools does not stop any student from reading or discussing the book, which surely would raise a more serious issue. *See Pico*, 457 U.S. at 921 (O'Connor, J., dissenting) (opining that a school board "surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it").

The plurality in *Pico* eschewed the idea of schools denying students "access to ideas." Today, though, denying students access to a particular book at a school library does not deny them access to the book or its ideas. The forty years since the Court decided *Pico* have allowed for easier and greater access to ideas more so than perhaps any other forty-year period since the invention of the printing press. If it were a violation of Plaintiffs' First Amendment rights, it would still injure them, cf. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ("every violation [of a right] imports damage"), but the harm would be slight in comparison to other violations of the First Amendment because they still have access to the ideas. Indeed, Plaintiffs

filed the eight books at issue with the Clerk of Court as exhibits, provided copies to Defendant, and provided courtesy copies to Chambers.  In other words, Plaintiffs argue they are irreparably harmed by the deprivation of access to ideas contained in these eight books while at the same time possessing, at one time, at least three copies of each book.  Nothing in the record plausibly suggests that the District's actions have made it or will make it especially difficult for students to obtain the books at issue through other means.

ii.  <u>Balance of the Harms and Public Interest</u>

In comparison, the injury an injunction would inflict on the District is considerable, and the public interest favors the District in this case.  At issue here is a facially neutral policy, by which the District decides whether books in its libraries should be removed, that a duly elected[6] and publicly accountable school board enacted.  As previously discussed, no one disputes that the District can remove books from its libraries for numerous reasons.  And, therefore, policies providing for when and why books will be removed are necessarily allowable.  The specifics of such a policy—especially where, like here, the policy is facially neutral—should not easily be second-guessed by a federal court.  *Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."); *Kuhlmeier*, 484 U.S. at 273; *see also Brach v. Newsom*, 2:20-cv-06472-SVW, 2020 WL 6036764, at *5 (C.D. Cal. Aug. 21, 2020) ("Plaintiffs' proposed constitutional right would at least unsettle 'local autonomy' in public education, which the Supreme Court has described as "'a vital national tradition.'" (quoting *Missouri v. Jenkins*, 515 U.S. 70, 99 (1995) (citation omitted))).

---

[6] Indeed, Wentzville School District Board of Education had an election for two of its seats in the election on April 5, 2022.

<u>CONCLUSION</u>

At this point in the litigation, Plaintiffs have not shown that the *Dataphase* factors weigh in their favor.  Thus, the Court will not issue a preliminary injunction at this time.  This conclusion imparts no opinion on the wisdom of the District's policy or on the educational suitability—or lack thereof—of any of the books at issue.  Even if the Court disagreed with the District's actions, "it is not the function of the courts to make the decisions that have been properly relegated to the elected members of school boards."  *See Pico*, 457 U.S. at 921 (O'Connor, J., dissenting); *accord Reeder v. Kansas City Bd. of Police Comm'rs*, 796 F.2d 1050, 1055 (8th Cir. 1986) (explaining "the limitations of constitutional litigation" do not allow a court to judge "the wisdom or fairness" of a law because "wisdom, fairness, and policy of statutes" are not the business the courts).

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction, Doc. [11], is **DENIED**.

Dated this 5th day of August, 2022.

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

- 21 -